Carl KNIGHT, Plaintiff,

v.

**FATHER FLANAGAN'S BOYS' HOME, Defendant.**

Civ. No. 77–0–271.

United States District Court, D. Nebraska.

Nov. 1, 1979.

---

Donald B. Fiedler, Omaha, Neb., for plaintiff.

Ronald T. Pfeifer, David A. Jacobson, Kutak, Rock & Huie, Omaha, Neb., for defendant.

SCHATZ, District Judge.

Carl Knight, a black male, brings this action against Father Flanagan's Boys' Home (herein Boys Town), his former employer, under the provisions of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.*, alleging that he was discriminated against on the basis of race when Boys Town failed to hire him for the position of family teacher alternate after his previous job as a child care worker had been eliminated. The case has been tried on its merits to this Court without a jury and is now ready for disposition. The following memorandum contains the Court's findings of fact and conclusions of law.

Boys Town is a not-for-profit Nebraska corporation which, among other things, provides a variety of youth care services for homeless and other disadvantaged young men and boys at its campus located near Omaha, Nebraska. Historically, those services were furnished at Boys Town in an institutional setting by independently organized service units: boys were housed on campus in dormitory-style residences, meals were prepared in a central dining hall, laundry was sent to a central laundry facility, and recreational activities were organized on a campus-wide basis. Each of the various service units was independently staffed with employees who lived off-campus and worked in rotating eight-hour shifts. These employees, or "child care workers," had primary responsibility for the direct supervision and care of the boys at Boys Town.

By the mid-1970's, the Boys Town administration had determined that significant changes in its organization structure and service policies were required to keep pace with changing social conditions and modern concepts of child care. In May of 1975, Boys Town hired Dr. Elery L. Phillips to fill the position of Director of the Department Youth Care. Dr. Phillips' primary task was to design and implement a working policy with respect to youth care services at the Boys Town campus.

Immediately after his arrival, Dr. Phillips began implementing at Boys Town a "family-teacher" model of child care, a behavioral technique developed by Dr. Phillips and other behavioral psychologists at the University of Kansas. The central feature of the family-teacher model is the concept that youth care services should be provided in a home environment with parents and a family rather than in an institutional setting with shift employees functioning as child care workers. Accordingly, the most conspicuous impact of Dr. Phillips' program on the organizational structure of Boys Town was the elimination of a number of independent service units and the adoption of their functions by autonomous "family" units.

Among the first steps toward implementing the family-teacher model was the transformation of campus dormitories into livable family-style dwellings or cottages, each designed to house no more than eight to ten boys. Eventually, forty-one such cottages were created and were divided into four groups or "Communities." Each cottage is equipped with its own washer and dryer, a complete kitchen and other incidents of ordinary family living. Each cottage is operated by a married couple who live in the home with their own natural children. The married couples, or "teaching-parents," have final responsibility for the supervision of the boys in their cottage. In addition to the teaching-parents, each cottage is staffed with a "family teacher alternate," an individual who assists the married couple and assumes responsibility for the boys when the teaching-parents are away from the home.

While creating positions for teaching-parents and alternates, the shift to the family living concept eliminated an even greater number of existing positions at Boys Town. To ease the impact of this fact on dislocated employees, Boys Town initiated a program whereby affected employees were placed on "surplus" status. Surplus status began when an employee was notified that his position was being terminated and continued through the following sixty days. While on surplus status, an employee continued to receive full benefits and pay, even if his position was terminated prior to the end of the sixty-day period. In addition, employees on surplus status were informed that the *Employee Newsletter*, a weekly Boys Town publication, listed available positions at the Boys Town campus. It was intended that surplus employees would be given preferential hiring treatment since available positions would be listed in the *Employee Newsletter* before Boys Town would advertise externally for those positions. Surplus employees wishing to apply for jobs listed in the *Employee Newsletter* were required to send a type of application known as a "response form" to the person designated in the newsletter as the hiring supervisor of the particular community seeking applications. Internal response forms sent to the various hiring supervisors were given consideration before external applications received through the personnel office.

Carl Knight's employment with Boys Town began in May of 1974, when he was hired as a temporary replacement for vacationing child care workers at one of the campus dormitories. Because of the seasonal nature of this position, Mr. Knight was terminated in October, 1974. On November 6, 1974, plaintiff was rehired by Boys Town on a full-time basis as a child care worker in the Orientation Center. The function of the Orientation Center was to house newly arrived youths for a period of several days while they were being introduced to the rules and policies of the Boys Town campus preparatory to their placement in a permanent living environment. While at the Center, various educational tests were given to the youths, medical and dental examinations were administered, clothing allotments distributed, and the like. Plaintiff's duties as an employee of the Orientation Center included scheduling tests for the youths, assisting in their supervision and familiarizing them with the various aspects of campus life. While employed at the Orientation Center, plaintiff attended classes at the University of Nebraska at Omaha and was allowed to arrange his hours of employment so they did not conflict with his class schedule. During the first several months of his employment, plaintiff alternated between day shifts and night shifts; thereafter, he began working full-time on the night shift.

On May 11, 1975, Dwite Pedersen, the director of the Orientation Center, filled out a routine written evaluation form regarding plaintiff's job performance. The form consists of a printed list of ten individually rated categories, followed by an eleventh category titled "OVER–ALL PERFORMANCE," under which is a line labeled "FINAL RATING." Plaintiff was given a final rating of 3½ on an ascending scale of 5, "3" being defined as "satisfactory" and "4" being defined as "above average."

Among the individually rated categories, paragraph 9 is entitled "DEPENDABILITY —Assumes responsibility—Need for supervision—Work attendance, etc." In rating this category, Mr. Pedersen circled the number "3" for "satisfactory," and underscored the term "Work attendance." The rating is followed by Mr. Pedersen's handwritten notation, "only satisfactory because he is a student at UNO."

On July 15, 1975, plaintiff was given a written reprimand in the form of a letter from Mr. Pedersen, which letter reads as follows:

In the past six weeks you have missed two scheduled overnights, Friday, May 30, and Thursday, July 10. As you know, an overnight consists of two eight-hour shifts, making it four days that you have missed with very short notice. It is impossible to operate a twenty-four hour Department when any one employee does not show up without good cause. Personal problems have been your excuse in both instances, however, they cannot interfere with the operation of your job. This letter is to formally tell you that, if this behavior does not improve in the very near future, it will be necessary for me to take stronger action, such as formal probaation [sic] and possible termination from your job.

This letter should also serve as a verbal probation notice.

At trial, Mr. Pedersen reiterated his evaluation that plaintiff was an "above-average" child care worker. He also testified that following the written reprimand he experienced no further disciplinary problems with the plaintiff.

By letter dated October 23, 1975, plaintiff and the other seven members of the Orientation Center staff were advised by Dr. Phillips that the Center would be closed as part of the shift to the family-teacher concept being implemented at Boys Town. The effective date of the closing was October 31, 1975, on which date a meeting was conducted by Dr. Phillips and representatives of the personnel department to discuss the impact of the closing on Orientation Center employees. The surplus status program was explained at this meeting, as was the response form system for internal placement. Plaintiff and the other Orientation Center employees were also informed that job openings at Boys Town would be listed in the *Employee Newsletter* and that those wishing to apply for such jobs would be required to file a response form with the appropriate individual in order to be considered for the position.

Plaintiff's surplus status ran from October 31, 1975, through December 31, 1975. During that period, plaintiff was assigned to a grade-school dormitory on the Boys Town campus to work as a part-time counselor over the Christmas season. It was understood that this position would terminate December 31, 1975. On December 6, 1975, plaintiff missed a scheduled shift after he had been jailed the previous night in Kansas City, Missouri, for a traffic violation and resisting arrest. Because of the temporary nature of plaintiff's position, no formal disciplinary action was taken as a result of this incident.

While on surplus status, plaintiff continued to receive the *Employee Newsletter*. Among the positions listed in the newsletter was that of family teacher alternate in Community I. This particular job description was listed in consecutive newsletters from November 12, 1975, through March 22, 1976. On December 16, 1975, plaintiff submitted a response form for the position of family teacher alternate to the hiring supervisor of Community I, who at that time was a black woman named Beverly Ayers.[1]

1. It has been a point of some dispute throughout this litigation whether the response form of December 16, 1975, was the only one submitted by the plaintiff. It is plaintiff's claim that he filled out and arranged to have submitted at least two, and perhaps three, additional response forms. Specifically, plaintiff testified at trial that he filled out a response form immediately after the meeting of October 31, and that he thought that form was later delivered to Steven Rowley in the Personnel Department, though plaintiff could not testify with certainty as to when or how the form might have reached Mr. Rowley. Plaintiff also testified

Evidence adduced at trial established that the receipt of a properly completed response form by the hiring supervisor began the evaluation process. In Community I, this process began with an initial screening interview between the applicant, the hiring supervisor and the director of Community I. From there, the name of the applicant would be placed on an internal applicant roster and forwarded to the teaching-parents of the particular cottage where the opening existed. The teaching-parents did the actual hiring for the position of family teacher alternate.[2]

A response form application is a one-page document, the upper half of which consists of typewritten headings followed by blank spaces for information and remarks to be supplied by the applicant. The lower portion of the page consists of a blank space located beneath the typewritten heading "SUPERVISOR'S REFERENCE." The response form submitted by plaintiff on December 16, 1975, contained the plaintiff's handwritten responses to all headings listed on the upper half of the page. There was, however, no supervisor's reference. Instead, plaintiff attached to his response form a separate handwritten note addressed to Beverly Ayers, the Community I hiring supervisor, which reads:

> Beverly:
>
> I have been unable to get ahold of Dwite Pedersen to submit a supervisory comment. If possible, could you call him and have him come over to fill that section in for me.

Because plaintiff's response form lacked a supervisor's reference or signature, Mrs. Ayers consulted Richard Baron, her immediate supervisor and the director of Community I. Mr. Baron advised Mrs. Ayers that incomplete response forms were not to be considered and that, therefore, no interview should be scheduled for plaintiff until a supervisor's reference had been obtained.

Plaintiff did not at any time after he submitted his response form on December 16, 1975, obtain a supervisor's reference. He did not at any time thereafter make any inquiry of Mrs. Ayers relative to obtaining employment in Community I. Mrs. Ayers likewise did not contact plaintiff either to schedule a screening interview or for any other purpose. Plaintiff was not thereafter rehired in any capacity by Boys Town.

In considering the merits of plaintiff's claim of racial discrimination in this case, it is appropriate at the outset to note several factors which are not in controversy. First, it is undisputed that defendant's shift to the family-teacher model of child care, and the consequent reduction in the Boys Town work force, were motivated by legitimate non-discriminatory considerations; plaintiff's claim of discrimination is not based on the elimination of his job in the Orientation Center, but on Boys Town's failure to hire him as a family teacher alternate. Secondly, there has been no showing by the plaintiff which would sustain a reasonable inference that Boys Town maintained racially discriminatory hiring policies generally.[3] Finally, there has been no direct evidence of

---

that during the second or third week of November, he filled out another response form and personally delivered the same to someone in the Social Service Department. The Court resolves the dispute created by this testimony by finding that only one response form—that dated December 16—was ever properly filed by the plaintiff for the position of family teacher alternate in Community I.

**2.** Dr. Phillips, as Director of the Department of Youth Care, possessed the ultimate authority to hire family teacher alternates in that his signature was required to place an applicant on the Boys Town payroll. Dr. Phillips testified, however, that he did not participate in the substantive evaluation of any applicant and

that he did not recall ever having refused to hire anyone recommended by the teaching-parents.

**3.** To the contrary, the only relevant evidence adduced at trial on this issue shows that the percentage of the Boys Town work force represented by minority employees was at all material times greater than that found in the work force in the Omaha metropolitan area generally. Plaintiff concedes the accuracy of this data. In addition, plaintiff has made no showing of any racially disparate impact in the hiring of family teacher alternates attributable to either the surplus status program or the hiring procedures actually used in Community I.

any racially discriminatory animus on the part of any of the persons having hiring authority for the position of family teacher alternate in Community I. Rather, plaintiff's theory of this case is that he has established an individual instance of racial discrimination based upon circumstantial evidence regarding his particular attempt to obtain employment with the defendant.

The analytical framework for evaluating claims such as the plaintiff's is well settled:

> In Title VII cases alleging individual instances of racial discrimination the plaintiff must carry the initial burden of establishing a prima facie case. Having done so, the burden then shifts to the employer to demonstrate valid non-discriminatory reasons for his actions. The plaintiff must then be given a fair opportunity to show that the reasons tendered by the employer are merely a pretext, thus demonstrating that the employer's conduct was in reality racially motivated. *Mosby v. Webster College*, 563 F.2d 901, 903 (8th Cir. 1977).

Although the type of circumstantial evidence sufficient to sustain an inference of racial discrimination will vary with the facts of the particular case, plaintiff places his reliance in this instance on his attempt to establish the existence of those factors enumerated by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), namely:

> [1] that he belongs to a racial minority; [2] that he applied and was qualified for a job for which the employer was seeking applicants; [3] that, despite his qualifications, he was rejected; and [4] that, after his rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications.

*Id.*, 411 U.S. at 802, 93 S.Ct. at 1824.

Upon consideration of all the evidence, the Court concludes that Boys Town's failure to hire plaintiff was not motivated by an impermissible consideration of plaintiff's race. This conclusion rests on two independently sufficient bases. First, it is uncontroverted that in order to be considered for positions listed in the Boys Town *Employee Newsletter*, surplus employees were required to file response forms with the hiring supervisor of the particular community seeking applicants. Beverly Ayers, the hiring supervisor of Community I, testified that it was her practice to schedule screening interviews with all applicants who had submitted completed response forms. She further testified that after discussing the matter with her supervisor, she did not schedule a screening interview with plaintiff because his response form was incomplete. The response form itself does not indicate the race of the applicant. Mrs. Ayers testified that at the time she handled plaintiff's response form, she did not know nor had she ever met plaintiff, and that she was unaware of his race at that time. Richard Baron, the director of Community I, also testified that he was unfamiliar with plaintiff or his race, and that the sole reason he had advised Mrs. Ayers to reject plaintiff's response form was because it was incomplete. The Court finds the testimony of Mrs. Ayers and Mr. Baron to be credible and accurate.

It is, of course, essential to the plaintiff's prima facie case that he show that he did in fact "apply" for the job in question. In the circumstances of this case, the submission of a response form without a supervisor's reference was tantamount to the filing of no response form at all. The practice of requiring a completed application form in order to be considered for employment has been held to be a fair and reasonable practice, of neutral and non-discriminatory racial impact. *See, e. g., Armstrong v. Ryder Truck Rental, Inc.*, 448 F.Supp. 185, 186 (D.Ariz.1978). This Court concludes that, whether viewed as a failure of an essential element of plaintiff's prima facie case or a rebuttal of the same by the showing of a legitimate non-discriminatory motivation, Boys Town has successfully established that the decision to reject plaintiff's application as incomplete was made in good faith, and that it was not based upon a consideration of plaintiff's race.

As a second basis for the denial of plaintiff's claim, the Court concludes that plaintiff has failed to prove that he was "qualified" for the position of family teacher alternate. While Boys Town does not claim that plaintiff was rejected *because* he was not qualified, the same remains an essential element of plaintiff's prima facie case, and a demonstrable lack of qualifications thus rebuts the inference of discriminatory treatment that would otherwise obtain from the rejection of a qualified applicant. In this connection, the Eighth Circuit Court has observed:

> Although the requirements of a prima facie case will vary from case to case, [plaintiff's] failure to apply and lack of qualifications for the job are clearly fatal to his complaint. The purpose of Title VII is to eliminate discrimination, not to saddle management with unqualified employees.

*Wright v. Stone Container Corp.*, 524 F.2d 1058, 1063 (8th Cir. 1975); *see also Morita v. Southern California Permanente Medical Group*, 541 F.2d 217 (9th Cir. 1976), *cert. denied*, 429 U.S. 1050, 97 S.Ct. 761, 50 L.Ed.2d 765 (1977).

Much attention has been focused by the parties on the issue of the plaintiff's qualifications and how the same should be measured. As is true for many jobs, the evaluation of those qualities which would make an acceptable and successful family teacher alternate is, to a certain extent, a subjective process. As noted above, hiring authority for the position was reposed at Boys Town with the house parents with whom the alternate would be working. Therefore, such intangibles as an applicant's apparent rapport with the house parents and the boys who lived in the cottage would ultimately weigh quite heavily in any actual hiring decision. However, the issue in this context is not whether the plaintiff or the defendant has proved that plaintiff either would or would not in fact have been hired. Rather, it is whether plaintiff has proved that he possessed those minimum or relative qualities which would have made him an acceptable candidate for the job.

■ On this particular issue, the evidence establishes a number of factors which were considered to be of great importance to the position of family teacher alternate. For instance, it is essential that an alternate be a dependable employee with a flexible work schedule since he may be called upon to assume responsibility for the boys in his cottage at any time, day or night. In addition, it is important that the alternate be able to "model" well for the youths, that is, that he be an exemplary role model in his conduct, character and demeanor. It is on these criteria that the parties clash most strongly.[4] Defendant points to plaintiff's

---

4. Boys Town does not contend that any specialized training, knowledge or prior work experience foreign to the plaintiff was required for the position of family teacher alternate. The evidence shows that at least one other former Orientation Center employee—a black woman named Evelyn Outlaw—was hired as an alternate in Community I.

It should also be noted at this juncture that by undertaking the analysis of this issue in terms of the plaintiff's "prima facie case," the Court does not mean to intimate that it is part of a plaintiff's initial burden to produce evidence tending to prove the nonexistence of all negative factors which may be relevant to an employment decision. This is especially true where events or personality traits which are not necessarily related to a plaintiff's past work experience are relevant to the instant decision. *See, e. g., Young v. Farmland Foods, Inc.*, CIV. 76–0–495, Slip Op. at 4 (D.Neb. June 7, 1979). However, once the employer has established the legitimacy of these criteria and has thereby called plaintiff's qualifications into question, the Court must then look to the evidence of both parties to determine whether a prima facie case has been established.

In this connection, the following comments from the Eighth Circuit Court's opinion in *Mosby v. Webster College, supra*, are pertinent:

> [A] "prima facie case" consists of facts sufficient to sustain the inference that the challenged action of the employer was motivated by impermissible considerations. In determining whether a prima facie case has been made, the district court must look to the evidence of both parties relating to the existence of those facts upon which the inference of discrimination depends.

*Id.*, 563 F.2d at 903 n. 2.

> [The employer] may refute the existence of a prima facie case by showing to be nonexistent the facts upon which the inference of discrimination is sought to be sustained.

512

past problems at Boys Town, when plaintiff admittedly missed a number of scheduled shifts, once on account of his having been jailed for resisting arrest. Testimony of Boys Town's witnesses was consistent in the conclusion that, based on his past work history, plaintiff would not have been an acceptable family teacher alternate. The Court finds this testimony to be credible and well-founded.

■ Plaintiff does not directly refute the defendant's testimony. Instead, plaintiff's singular response is that in the ordinary course of events, the teaching-parents in Community I would not have discovered plaintiff's shortcomings. Specifically, plaintiff points to the fact that the incidents surrounding his arrest were not made a part of his personnel file, and claims that the written reprimand given by Dwite Pedersen resulted only from an idiosyncrasy of Mr. Pedersen's in reducing such matters to written form. The central thrust of plaintiff's argument goes to the question of whether plaintiff would in fact have been hired, an inquiry which, as noted above, is not material. The alternative and relevant implication is plaintiff's apparent assertion that an applicant is somehow "qualified" for a job if circumstances are such that disqualifying factors can be successfully suppressed. The Court rejects the logic of this contention and holds that plaintiff has not carried his burden of establishing his qualification for the job of family teacher alternate.

Accordingly, for the reasons stated above, a separate order will be entered herein this date dismissing plaintiff's complaint.

---

Were this the case, the plaintiff would have failed to carry his initial burden and the em-

ployer need do no more. *Id.*, 563 F.2d at 903–04.