Donnell Richard MOSLEY, et al.

v.

**CLARKSVILLE MEMORIAL
HOSPITAL.**

**Civ. A. No. 78–3283–NA–CV.**

United States District Court,
M.D. Tennessee,
Nashville Division.

March 2, 1983.
On Damages and Front Pay
Aug. 31, 1983.

W. Henry Haile, Nashville, Tenn., for plaintiffs.

Stafford McNamee, Jr., Nashville, Tenn., for defendant.

### MEMORANDUM

JOHN T. NIXON, District Judge.

Donnell R. Mosley, the original plaintiff brought suit under Title VI and VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000d and e, *et seq.* (1980), 42 U.S.C. § 1981, § 1983, § 1985 and § 1988 (1980), charging his former employer, Clarksville Memorial Hospital, with racial discrimination in its employment practices. This Court has jurisdiction pursuant to 28 U.S.C. § 1331(a), § 1337 and 42 U.S.C. § 2000e, *et seq.* (1980). Plaintiff brought this suit as a class action. On September 7, 1979, plaintiff was granted leave to amend the complaint to add additional

plaintiffs Nora Merriweather, Edith Poindexter, Sarah Jordan, Janice Bowen and Ceresa Graves, all present or former employees of Clarksville Memorial Hospital. On November 16, 1979, plaintiffs were granted leave to file a Second Amended Complaint adding Lenore Ramey as a plaintiff. Ms. Ramey is the only plaintiff who is not an employee or a former employee of Clarksville Memorial Hospital; Ms. Ramey's complaint was that she was not hired because of her race.

A hearing was held on the plaintiff's motion to certify a class pursuant to Rule 23 of the Federal Rules of Civil Procedure and, on September 29, 1980, this Court issued its Order and Memorandum Opinion certifying a limited class of black employees and former employees. Mr. Mosley was certified as the sole representative of the class and the class was defined as all black persons who are, or were, employees of Clarksville Memorial Hospital who were qualified for, but were denied, promotions in positions which were later filled by whites, and who were in the employ of Clarksville Memorial Hospital, on or after May 24, 1976. In addition, the class includes black employees who are or were being paid less than white employees while filling the same positions. The class was conditionally certified pursuant to Rule 23(b)(2) and Rule 23(c)(1) for declaratory relief that defendant's acts, policies, practices and procedures violate rights guaranteed under Title VII of the Civil Rights Act of 1964, as amended, and other laws. The class was also conditionally certified for potential injunctive relief. The Court also certified a Rule 23(b)(3) subclass of black employees of the hospital who seek compensatory damages for mental distress as a result of the hospital's alleged discriminatory policies and practices. Excluded from this subclass are black employees who left their employment prior to July 6, 1977 or who were denied equal pay or promotions before that date.

The defendant, Clarksville Memorial Hospital is a public agency organized by an Act of the Tennessee General Assembly and funded by the taxpayers. Its acts constitute "state action" for purposes of the plaintiffs' claims pursuant to 42 U.S.C. § 1983.

The case came on for trial on April 8, 1981 upon the allegations pertaining to the classes certified and conditionally certified and the allegations of Lenore Ramey, individually.

The original plaintiff in this case, Donnell R. Mosley, is a black resident of Clarksville, Tennessee. His suit was predicated upon a timely right to sue letter issued after he filed a complaint of discrimination with the Equal Employment Opportunity Commission (EEOC) on November 19, 1976. In addition to other causes of action, which are common to other members of the class, Mosley individually contends that the hospital failed to honor a conciliation agreement executed May 28, 1976, which required that he be promoted out of the hospital housekeeping department to the next available position elsewhere in the hospital for which he was qualified.

Mosley first applied for employment at the Clarksville Memorial Hospital on August 21, 1973. He attended Austin Peay State University in Clarksville for approximately two years, prior to applying for employment at the hospital, and also worked part-time at the University as a clerk and clerk-typist. Mosley expressed a preference for a clerical position at the hospital, but stated on his application that he would accept any available job. When the hospital made inquiry at Austin Peay about Mosley's clerical job performance, his former supervisor gave him a good recommendation. Defendant concedes that he was a "competent typist".

It has been and is the practice of the defendant, in 1973 and at the time of trial, to classify job applications by department. Mrs. Katye Shelton, hospital Personnel Director, placed Mosley's application among the other applications for jobs in the dietary and housekeeping departments. The organization of those two departments included positions which were traditionally held by blacks. At the time of Mosley's

application, no black had ever held a clerical position in the hospital business office.

Mosley made application to the hospital in August 1973 and was hired in September 1974 as a dishwasher in the dietary department, a position which had always been held by blacks. During a part of the time that his application was on file with the hospital, from February to May 1974, Mosley was employed as a technical assistant at Arnold Engineering and Development Center in Tullahoma, Tennessee. His responsibility at that U.S. Government facility included ordering of parts, reading of gas meters and some clerical work. He was terminated from that employment because his overall performance was not satisfactory, but his supervisor informed the personnel director at Clarksville Memorial Hospital that Mosley had been "one of the best typists I have ever seen".

Mosley's performance as a dishwasher was good and in January 1976 he transferred for the convenience of the hospital to the housekeeping department. There he worked as a porter, cleaning rooms, mopping floors and doing other menial tasks. In September 1975 at the end of his first year as an employee at the Clarksville Memorial Hospital, he was given an excellent job performance evaluation by his supervisor.

Mr. Mosley's relationship with the hospital began to change in December 1975. That month he expressed a desire to transfer to a position as clerk in the dietary department, one that he had learned would soon be vacated by an encumbered white female. This position was one that had never been held by a black. Mosley contacted Mrs. Shelton, the personnel director, about this prospective opening, and she gave him a typing examination which he passed on December 31, 1975.

In January 1976, Mosley discovered that the clerkship in the dietary department had been filled by another white female. He made inquiry of personnel director Shelton and was told that the reason he did not get the dietary position was that his performance in the housekeeping department was

unsatisfactory. Shelton showed him a copy of a memorandum signed by the supervisor of the housekeeping department and dated December 26, 1975, which contained reports that Mosley had left work early, and had not performed his work on occasion. Hospital personnel policy provides that all written disciplinary reports be shown to the employee before being included in a personnel file. The reports had never been shown to Mosley prior to their disclosure to him by Shelton. Mosley immediately confronted his supervisor, insisted the reports were false and demanded the opportunity to confront those who had made the complaints.

Several weeks later Mosley filed a written complaint of discrimination with the Tennessee Commission for Human Development. His written response to the allegations in the December 16, 1975 memorandum were submitted to that agency. On May 28, 1976, the hospital signed a conciliation agreement with Mosley and the Human Development Commission, in which, among other things, it promised to promote Mosley out of the housekeeping department into the first available position for which he was qualified. Six days prior to execution of the May 28, 1976 conciliation agreement, while the conciliation effort between the Commission and the hospital was under way, Mosley received another disciplinary write-up. This second write-up was signed by the white supervisor of the housekeeping department and two black employees, Holmes and Robertson. Holmes did not testify at the hearing, but Mosley called Robertson in rebuttal. He then testified that Mosley was a good employee, that his work record was above average in the housekeeping department, and that on no other occasion had he been asked to sign a written disciplinary report on an employee for infractions of the minor nature as those charged against Mosley.

Mosley was never contacted by the hospital regarding any opening outside of the housekeeping department. In August 1976, he saw a job posted on the hospital bulletin board for a clerk in the business office. No black person ever held such a

position at the hospital, although many blacks had applied. Mosley contacted Shelton about the job. Shelton stated that she would contact the white supervisor of the business office. Upon later inquiry by Mosley she replied that the white male supervisor was not certain the vacancy would be filled. Later it was filled by a white female. There is nothing in the record to indicate the white female's qualifications. According to hospital policy, an employee could transfer from one department to another only with the approval of both departmental supervisors. The supervisor of the business office refused to accept Mosley.

On September 7, 1976, Mosley complained in writing to Cornelius Jones (now deceased), director of the Tennessee Commission for Human Development. At trial the hospital administrator testified that Jones telephoned him about the complaint. Wright, the administrator, testified that he responded to Jones that Mosley's work performance in the housekeeping department had been unsatisfactory. After this conversation, another write-up, dated September 14, 1976, was prepared. This write-up, a copy of which was sent to Jones, detailed numerous occasions of tardiness on the part of Mosley during the period of October 27, 1975 to September 12, 1976. (Mosley himself has admitted to tardiness during this period.) On September 21, 1976, the hospital evaluated Mosley as a poor and uncooperative employee. On November 19, 1976, Mosley filed a charge of discrimination with the EEOC, alleging that blacks had been denied transfer and promotion opportunities as well as salary benefits because of race. Mosley further complained that the hospital had not complied with the terms of the conciliation agreement.

At about this time the hospital entered into a contract with Servicemaster, Inc., a private company for the administration of the housekeeping department. Under the terms of the contract, which took effect on January 1, 1977, Servicemaster was to utilize the incumbent housekeeping employees and provide one employee of its own, a supervisor. All of the incumbered employees were black and the new supervisor was white. Mosley did not return to work after December 31, 1976. On January 19, 1977, he telephoned the new supervisor and informed him he would not be back. A "Summary of Employee" form filled out at that time rated Mosley fair in all areas except "quality of work", "attitude towards his co-workers", "leadership ability", and "potential" in which he was rated poor. The department head stated on the form that he would not rehire Mr. Mosley.

Plaintiff Nora Meriweather worked as a nurse's aide and kitchen worker until she re-applied for a position at Clarksville Memorial Hospital on February 2, 1976. She requested employment as a nurse's aide as first preference, laundry or housekeeping as next preferences. In May 1976, Meriweather was re-employed in the laundry department. The hospital insists no vacancy existed at that time in the nurse's aide department. Several weeks later, after the conciliation agreement between the hospital and Mosley and the Tennessee Commission for Human Development had been signed, Meriweather requested a transfer to a nurse's aide opening and received it. However, she was placed in the first salary step in that position despite a hospital policy requiring advanced steps on the salary scale based on experience. A white woman who had held the same position at the convalescent home where Meriweather had worked and who applied at the hospital at approximately the same time that she did, was hired, not in the laundry, but as a nurse's aide and given credit for her experience. She started at an advanced step on the nurse's aide scale. It is the hospital's position that it was not aware of the extent of Meriweather's experience and upon discovery of that fact, it switched her to the second step of the wage scale.

Plaintiff Edith Poindexter is a black employee in the housekeeping department. She was hired full-time on September 11, 1964, in the position for which she applied. She has never asked to be transferred to another position. In her deposition she testified that she has not been discriminated

against by the hospital. Poindexter's complaint is that two of her children, a son and a daughter, were refused employment by the hospital. The son applied for a position as a porter, a traditionally black job, and was not hired. The daughter applied for a clerk's position and was not hired. She had no previous experience for that job. The hospital has hired blacks in that position since she was rejected. Another son of Ms. Poindexter has been employed by the hospital since 1969. He has received several promotions and transfers and is now an operating room technician.

Plaintiff Sarah Jordan made application for employment at the hospital in October 1969, stating preferences for nurse's aide, kitchen and housekeeping. She had no prior experience as a nurse's aide. One year later she was hired in the housekeeping department and has remained there ever since. She did have previous experience as a housekeeper and as a waitress. In January 1979, Jordan requested a transfer to an open position in the snack bar, which is within the dietary department. The hospital, however, hired a white woman for the job who had no previous experience. After three days on the job, the white woman quit and the job was offered to Jordan. She was informed by the dietary supervisor that she would have to work the shift that began at midnight, but Jordan accepted the job. Then she was informed that she would have to take a significant cut in pay. At that point, she declined the snack bar job. The personnel director noted in Jordan's file that she had been offered the position in the snack bar and had rejected it because of the salary cut. The personnel director also noted that the position was "part-time", but that statement was incorrect. The hospital does not claim that the position was ever part-time.

It is not clear from the evidence before this Court what is the history of black employment in the snack bar. Prior to 1974, the snack bar was operated by the hospital auxiliary, a volunteer group. From 1974 until 1979, when Jordan applied for the snack bar position, three blacks worked there, according to the personnel director. The plaintiffs dispute this and point out that one of the three, Kim Teixeria, was designated by the defendant as Hispanic in answer to an interrogatory. In any event, the three individuals claimed by the hospital to be black, worked only a short period of time in the snack bar in 1976. From 1976 until 1979, there was only one black among sixteen new employees hired for positions in the snack bar.

Plaintiff, Janice Bowen, an LPN, alleges that another LPN, Barbara Pardue, who is white, was promoted to medication LPN prior to Bowen although Bowen had seniority. The personnel records reflect that Bowen resigned her position with the hospital on February 4, 1977 and that Pardue was promoted to medication LPN on February 14, 1977. Bowen returned to work at the hospital on May 16, 1977, as a general duty LPN. Pardue resigned on March 29, 1978 and Bowen was promoted to medication LPN on April 10, 1978. Bowen also complains that Linda Brown, a white LPN, was being paid at a higher rate than Bowen even though Brown was hired after Bowen. Brown, however, had three years previous experience as a charge and medical nurse at other hospitals, and it appears that she was hired at the second step of the wage scale in accordance with hospital policy.

Plaintiff Ceresa Graves applied for a nurse's aide position at the hospital but was hired as a nurse-technician, a position that is higher on the wage scale. Her prior education and training qualified her as a nurse-technician. Graves alleged that Bonnie Colon, a white nurse's aide, was being paid at a higher rate than she was. The pay records of the hospital reflect that Colon is not and has not been paid at a higher rate than Graves.

Plaintiff Lenore S. Ramey applied for employment at the hospital on several occasions. She filed applications from the time she graduated from high school through May 1978. Among the positions she sought were nurse's aide, x-ray runner, retractor aide, and snack bar employee. She regularly called the hospital personnel

office about job openings and updated her application. Ramey had several months previous experience at a blood bank, but no previous experience in patient care. The hospital has not hired anyone as a nurse's aide, black or white, whose only previous experience was at a blood bank. However, Ramey indicated to the personnel director her willingness to accept employment in other departments, including housekeeping. In February 1979, Ramey contacted the personnel director and threatened to report the hospital to the NAACP. At that point the personnel director contacted Ramey's references and set up an interview in May. Nevertheless, Ramey was not hired. At trial the personnel director testified that after the February 1979 telephone call, which she described as rude, she had no intention of hiring Ramey.

The surrounding relevant labor area was stipulated as Montgomery County with a civilian labor force at 17% non-white. Non-Whites comprise 7.3% of the employed professional, technical, medical and health workers in this area and non-whites comprise 4.7% of the employed clerical workers. In January 1975, 28.95% of the Hospital's work force was black. In 1976, the figure was 28.8% and in 1977, the figure was 27.82%. In January 1978, the figure rose to 29.28%, in June, 1978, one month prior to suit being filed, Clarksville Memorial Hospital employed 27.8% minorities in its work force, and in January 1979, it was 27.5%. In January, 1981, the percentage of black employees at the Hospital was 23.67% and, in March 1981, one month prior to trial, the percentage of non-white employees at the hospital was 25%.

The hospital is divided into departments and the housekeeping, laundry and dietary departments contain a majority of minority employees. Salaries in these departments are at the lower end of the pay scale. In addition to housekeeping, laundry and dietary, the hospital is divided into the following departments: nursing, x-ray, laboratory, pharmacy, physical therapy, medical records, maintenance, respiratory therapy, administration and security. The nursing department is the largest department in the hospital and contains more than 50% of the total employees in the hospital. In June, 1978, there were 269 employees in the nursing department, 64 of whom were minority or approximately 24%.

A number of the positions in the nursing, laboratory, pharmacy, physical therapy and x-ray departments require special qualifications in order to hold the positions. Most of these, such as registered nurse, license practical nurse, respiratory therapist, pharmacist and others require advanced education and training. Such advanced education and training is not available at the hospital and is not conducted by the hospital. Unless applicants have the required education and training and the license, registration or certification required by state law, they cannot be hired into, transferred into or promoted into these positions.

Testimony presented by the hospital indicates that it has hired every black RN and LPN who has applied since 1976. There is a shortage of nurses throughout the area and the pay scale for Clarksville Memorial Hospital for nurses is substantially lower than at other hospitals with whom it competes for nurses in the area. The evidence revealed that only one black nurse had been refused employment during the 1970's and that was an application for re-employment which was refused due to the prior work record of the applicant. The testimony revealed that a number of white nurses had been refused re-employment. The hospital generally employs all of the professional personnel who apply even to the point of overstaffing a position, if applicants are available, in anticipation that turnover will soon resolve the overstaffing problem. Occasionally there are situations where a nurse applicant insists on working a certain shift and the nurse is not employed but no one could recall this ever happening in the case of a black nurse applicant.

During the period May 1, 1976 through March 28, 1981, there were 960 applicants employed by the hospital. Of these 960 persons, 26.15% were non-white and 20.21%

were black. Those hired encompassed all positions.

The hospital introduced an exhibit setting forth the new employees in clerical positions from 1975 forward. In 1975 three white women, two part-time and one full time, were hired in clerical positions. In 1976, thirteen persons were hired into clerical positions and one who was hired part-time in 1975 was changed to full time. Two of the new employees in 1976 were non-white while 14.28% of those hired in 1976 were non-white. In 1977 fifteen persons were hired into clerical positions, three of whom were black or 15%. In 1978, ten persons were hired full time and three part-time to clerical positions. Three of these new employees or 23% were non-white. In 1979, nineteen persons, five of whom were black, were hired into clerical positions; thus, 26% were non-white. In 1980, fifteen persons were hired, one of whom was black or 6%. In 1981 to the date of trial, three clericals were hired, one of whom was black or 33%.

During the period 1975 to the date of trial, there were 168 promotions or requests for transfer at the hospital; 108 were from white employees and 60 were from black employees. Of the 108 promotions or requests for transfer from white employees, 81 were granted and 27 were refused. Of the 60 requests by black employees, 49 were granted and 11 were not (one of these was Ms. Jordan who was granted the transfer but she refused due to the cut in salary). In at least three situations where a black employee was refused a promotion or transfer, the employee who actually got the position was black. In the remaining instances that blacks were not transferred, either the white was clearly the more qualified or the position went unfilled. In comparing the approval rates between white and black employees, 75% of the white requests were granted and 82% of the black requests were granted.

## CONCLUSIONS OF LAW

Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e, *et seq.* (1980), embodies our national policy against employment discrimination. The Act makes it unlawful

> to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or
>
> to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.

42 U.S.C. § 2000e-2(a)(1) and (2). As explained by the Supreme Court in *Griggs v. Duke Power Co.*, 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971), "[t]he objective of Congress in the enactment of Title VII is plain from the language of the statute. It was to achieve equality of employment opportunities and remove barriers that have operated in the past to favor an identifiable group of white employees over other employees." *Id.* at 430–31, 91 S.Ct. at 853. Moreover, as noted by the Sixth Circuit the goal of Title VII applies with equal force to sex discrimination. *Chrisner v. Complete Auto Transit, Inc.*, 645 F.2d 1251, 1256 (6th Cir.1981) (citing *Dothard v. Rawlinson*, 433 U.S. 321, 97 S.Ct. 2720, 53 L.Ed.2d 786 (1977)).

The courts have developed two separate and distinct theories to eliminate employment discrimination under Title VII. Interpretations of § 703(a)(2), 42 U.S.C. § 2000e-2(a)(2), has developed the disparate impact theory while interpretations of § 703(a)(1), 42 U.S.C. § 2000e-2(a)(1), has developed the disparate treatment theory, which are both available to a plaintiff to prove a case of unlawful employment discrimination. *Rowe v. Cleveland Pneumatic Co. Numerical Control*, 690 F.2d 88, 92 (6th Cir.1982); *Chrisner*, 645 F.2d at 1257.

A prima facie case under the disparate impact theory, articulated by the Supreme Court in *Griggs*, requires that the plaintiff

demonstrate that a facially neutral employment practice falls more harshly on or adversely impacts on a protected group than another and that this practice is not justified by business necessity. *Griggs*, 401 U.S. at 430–31, 91 S.Ct. at 853–854. *International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 348–49, 97 S.Ct. 1843, 1861–1862, 52 L.Ed.2d 396 (1977). Under the disparate impact theory an employer's "good intent or absence of discriminatory intent does not redeem employment procedures ... that operate as 'built-in headwinds' for minority groups and are unrelated to measuring job capability." *Griggs*, 401 U.S. at 432, 91 S.Ct. at 854. Thus, proof of intentional or purposeful discrimination is not required in order to establish a prima facie case of discrimination under the disparate impact theory. *Rowe*, 690 F.2d at 92.

The order and allocation of the burdens of proof in a disparate impact case involves a three-step process. First, the plaintiff has the burden of establishing a prima facie case which shows that the challenged employment practice or policy of the defendant has an adverse or disproportionate effect on members of a protected class. Second, the burden shifts to the defendant to establish that the challenged employment practice or policy is mandated by business necessity or has a manifest relationship to the employment in question. Third, if the defendant satisfies its burden of showing job relatedness, then the plaintiff has the opportunity to show that alternative employment practices or policies, without an adverse effect, will also serve the employer's legitimate interest. *Abemarle Paper Company v. Moody*, 422 U.S. 405, 425, 95 S.Ct. 2362, 2375 (1975); *Griggs*, 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971).

In establishing a prima facie case under the disparate impact theory statistics are often necessary to show a disparity involving a protected class. The Supreme Court explained the rationale for using statistics in *Teamsters*, 431 U.S. at 341 n. 20, 97 S.Ct. at 1857 n. 20, stating:

Statistics showing racial or ethnic imbalance are probative in a case such as this one only because such imbalance is often a telltale sign of purposeful discrimination; absent explanation, it is ordinarily to be expected that nondiscriminatory hiring practices will in time result in a work force more or less representative of the racial and ethnic composition of the population in the community from which employees are hired. Evidence of longlasting and gross disparity between the composition of a work force and that of the general population thus may be significant even though § 703(1) makes it clear that Title VII imposes no requirement that a work force mirror the general population. *See, e.g., United States v. Sheet Metal Workers Local 36*, 416 F.2d 123, 127 n. 7 (CA 8 1969). Considerations such as small sample size may, of course, detract from the value of such evidence, *see, e.g. Mayor of Philadelphia v. Educational Equality League*, 415 U.S. 605, 620–621, 94 S.Ct. 1323, 1333, 39 L.Ed.2d 630.

"Since the passage of the Civil Rights Act of 1964, the courts have frequently relied upon statistical evidence to prove a violation ... In many cases the only available avenue of proof is the use of racial statistics to uncover clandestine and covert discrimination by the employer or union involved." *United States v. Ironworkers Local 86*, 443 F.2d at 551. *See also, e.g. Pettway v. American Cast Iron Pipe Co.*, 494 F.2d 211, 225 n. 34 (CA 5 1974); *Brown v. Gaston County Dyeing Mach. Co.*, 457 F.2d 1377, 1382 (CA 4 1972); *United States v. Jacksonville Terminal Co.* 451 F.2d, at 442; *Parham v. Southwestern Bell Tel. Co.*, 433 F.2d 421, 426 (CA 8 1970); *Jones v. Lee Way Motor Freight, Inc.*, 431 F.2d 245, 247 (CA 10 1970).

Although percentage comparisons when based on small sample sizes may not be relevant, *Rowe*, 690 F.2d at 94, statistical comparisons using percentages may be used to show a statistical disparity involving a protected class and a particular employment practice or policy and thereby

establish a prima facie case of employment discrimination. *See, e.g., Equal Employment Opportunity Commission v. Ball Corp.*, 661 F.2d 531, 537 (6th Cir.1981); *Marsh v. Eaton Corp.*, 639 F.2d 328, 329 (6th Cir.1981); *Harless v. Duck*, 619 F.2d 611, 614–15 (6th Cir.1980), *cert. denied*, 449 U.S. 872, 101 S.Ct. 212, 66 L.Ed.2d 92 (1980). *See also Hazelwood School District v. United States*, 433 U.S. 299, 307, 97 S.Ct. 2736, 2741, 53 L.Ed.2d 768 (1977) (relying on *Teamsters* ). *See generally* Note, "Beyond the Prima Facie Case In Employment Discrimination Law: Statistical Proof and Rebuttal," 89 *Harv.L.Rev.* 387, 390 n. 8 (1975). The proper comparison when construing statistics involving percentages is between the relevant work force and the qualified population in the relevant labor market. *Davis v. Califano*, 613 F.2d 957, 963–64 and n. 40 (D.C.Cir.1979) (citing *Hazelwood School District*, 433 U.S. at 308, 97 S.Ct. at 2741–2742 and *Kinsey v. Regional Securities, Inc.*, 181 U.S.App.D.C. 207, 216, 557 F.2d 830, 839 (1977)). Moreover, when special qualifications are required for a job, promotion or transfer, then the statistics must take into account the special qualifications required for the position in question. *Hazelwood School District*, 433 U.S. at 308 n. 13, 97 S.Ct. at 2742 n. 13.

In applying the disparate impact theory to this case, the Court finds that the statistics in no way support an inference from which this Court could find unlawful class-wide discrimination in violation of Title VII, § 703(a)(2), 42 U.S.C. § 2000e–2(a)(2). The statistics clearly show that from January 1975 through January 1981, the defendant has consistently employed more minorities than in the relevant labor area. Moreover, the promotion statistics also clearly demonstrate no adverse impact on blacks when they request promotions. In those jobs requiring special qualifications, such as RN and LPN, the proof reflects no disparate impact on blacks. In fact, every black RN or LPN who has applied since 1976 has been hired. Thus, it is the considered judgment of this Court that the defendant's nondiscriminatory hiring practices have in fact resulted in a "work force more or less representative of the racial and ethnic composition of the population in the community from which employees are hired." *Teamsters*, 431 U.S. at 340 n. 20, 97 S.Ct. at 1857 n. 20.

A prima facie case under the disparate treatment theory, articulated by the Supreme Court in *McDonnell-Douglas v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), requires the plaintiff to demonstrate that the employer has treated some people less favorably than others because of their race, color, religion, sex or national origin. *Teamsters*, 431 U.S. at 335 n. 15, 97 S.Ct. at 1854–1855, n. 15; *Rowe*, 690 F.2d at 92. The plaintiff can establish a prima facie case by showing that (1) he belongs to a protected class; (2) he applied and was qualified for the job for which the employer was seeking applicants; (3) despite his qualifications, he was rejected, and (4) after his rejection, the position remained open and the employer continued to seek applicants with the plaintiff's qualifications. *McDonnell-Douglas*, 411 U.S. at 802 and n. 13, 93 S.Ct. at 1824 and n. 13. *See also Brown v. State of Tennessee*, 693 F.2d 600 (6th Cir.1982) (disparate treatment failure to promote case).[1] Unlike the disparate impact theory, a plaintiff under the disparate treatment theory must prove purposeful or intentional discrimination, which

---

**1.** In order to establish a prima facie case of discriminatory failure to promote, the Sixth Circuit has adopted the *McDonnell-Douglas* disparate treatment test as formulated by Judge J. Skelly Wright in *Bundy v. Jackson*, 641 F.2d 934 (D.C.Cir.1981). *Brown v. State of Tennessee*, 693 F.2d 600, 603 (6th Cir.1982). Judge Wright wrote,

"Adjusting the *McDonnell* formula cases of discriminatory refusal to promote is relatively simple. Thus to make out a prima facie case the plaintiff must show that she belongs to a protected group, that she was qualified for and applied for a promotion, that she was considered for and denied the promotion, and that other employees of similar qualifications who were not members of the protected group were indeed promoted at the time the plaintiff's request for promotion was denied. *Id.* at 603 (quoting *Bundy*, 641 F.2d at 951).

may be inferred from the evidence. *Teamsters,* 431 U.S. at 335 n. 15, 97 S.Ct. at 1854–1855 n. 15; *Rowe,* 690 F.2d at 92.

■ The order and allocation of the burdens of proof in a disparate treatment case also involves a three-step process. First, the plaintiff has the burden of proving by a preponderance of the evidence a prima facie case of discrimination. Second, the burden shifts to the defendant to rebut the presumption of discrimination, which arises after a prima facie case is established, by articulating some legitimate non-discriminatory reason for the employee's rejection. Third, the plaintiff has the opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant are a pretext for discrimination. *Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 253–56, 101 S.Ct. 1089, 1093–1095, (1981); *McDonnell-Douglas Corporation,* 411 U.S. 802–04, 93 S.Ct. 1824–1825. *See also Rowe,* 690 F.2d at 96–97; *Brown,* 693 F.2d at 605.

Applying the disparate treatment theory to the individual plaintiffs, in this case, the Court finds a violation of Title VII, § 703(a)(1), 42 U.S.C. § 2000e–2(a)(1), only as to the plaintiff Mosley.

■ The allegations of the plaintiff Meriweather, of discriminatory payment of wages, do not satisfy the disparate treatment theory because the defendant has admitted an error in calculating her pay and has corrected that error. Thus, this Court concludes that any discrimination she suffered on the basis of pay has been remedied.

■ The plaintiff Poindexter has shown no violation of the Act because she is not an "aggrieved person" within the meaning of § 706, 42 U.S.C. § 2000e–5.[2] Ms. Poindexter asserts no actual injury to her due to discrimination by the defendant and, consequently, she has no standing to assert a violation of the Act. *See e.g., Senter v. General Motors Corp.,* 532 F.2d 511, 517

(6th Cir.1976), *cert. denied,* 429 U.S. 870, 97 S.Ct. 182, 50 L.Ed.2d 150 (1976). *See generally,* Schlei & Grossman, *Employment Discrimination Law* 830–35 (1976). Neither does Ms. Poindexter have standing to assert a violation of Title VII by alleging discrimination against her son and daughter by the defendant because "standing is not granted to vindicate the rights of third parties." *Senter,* 532 F.2d at 517. Finally, Ms. Poindexter does not have standing on the basis of the "on behalf of" language in § 706(b), 42 U.S.C. § 2000e–5(b), because she is not the class representative. *Id.* at 518.

■ The plaintiff Jordan was not discriminated against by the defendant because she rejected the job after the defendant offered it to her. Thus, the plaintiff has not shown that the defendant has treated her "less favorably than others", *Teamsters,* 431 U.S. at 335 n. 15, 97 S.Ct. at 1854 n. 15, and, thus, cannot establish discriminatory refusal to hire on the basis of race.

■ The plaintiff Bowen has failed to satisfy the disparate treatment theory because she did not show she was considered for and denied a promotion by the defendant. The proof shows that the plaintiff was not considered for a promotion because of her voluntary resignation. Moreover, given the defendant's policy of tying experience with compensation, plaintiff Bowen has failed to show dissimilar treatment on the basis of pay.

Similarly, plaintiff Graves' assertion of discriminatory payment of wages was not established. The proof failed to show that white employees were being paid more than Ms. Graves. Thus, the Court concludes that the defendant did not discriminate against Ms. Graves.

■ The plaintiff Ramey asserts discriminatory refusal to hire on the basis of race. She sought a position as a nurse's aide. The proof, however, clearly estab-

---

**2.** Section 706(b) provides, in part, as follows: Whenever a charge is filed by or on behalf of a person claiming to be aggrieved, ... alleging that an employer.... has engaged in an unlawful employment practice, the Commission shall serve a notice of the charge ....

lished that she lacks the requisite qualification of experience in patient care. Her lack of qualifications precludes her from establishing a prima facie case. It is well-settled law that a plaintiff must establish qualifications for the position sought, *Morita v. Southern Cal. Permanente Medical Group,* 541 F.2d 217, 219 (9th Cir.1976), because a "demonstrable lack of qualifications rebuts the inference of discriminatory treatment" present if the defendant rejected a qualified applicant. *Knight v. Father Flanagan's Boys' Home,* 479 F.Supp. 505, 511 (D.Neb.1979). Although the purpose of Title VII is to remove "artificial, arbitrary and unnecessary barriers to employment", the Act does not eliminate an employer's proper use of essential qualifications. "Far from disparaging job qualifications as such, Congress has made such qualifications the controlling factor, so that race, religion, nationality, and sex become irrelevant." *Griggs,* 401 U.S. at 431 and 436, 91 S.Ct. at 853–854 and 856. Moreover, although the plaintiff Ramey sought other positions her rudeness to the defendant is a legitimate nondiscriminatory reason not to consider her for those positions.

▮ The plaintiff Mosley claims discrimination by the defendant in refusing to transfer him to a clerk position in the hospital. Upon consideration of all the evidence, it is the opinion of this Court that the defendant discriminated against Mr. Mosley in refusing to transfer him into a clerk's position because of his race. In so doing, it is also the judgment of this Court that the defendant violated the conciliation agreement signed in May 1976. Mr. Mosley satisfies the *McDonnell-Douglas* disparate treatment theory thereby establishing a prima facie of discrimination. First, the proof is clear that Mr. Mosley, being a member of a protected group, applied for a transfer for which he was qualified. On at least three occasions the plaintiff applied for a clerk's position in the hospital. On August 21, 1973, when he initially applied for a job with the defendant, he expressed an interest in a clerk-typist position. Again, in December 1975 and in August 1976, Mosley sought vacant clerk's posi-

tions. Second, at all relevant times the plaintiff was qualified for the clerk position. The defendant conceded that when the plaintiff was initially hired, he was a competent typist. Moreover, not only did the plaintiff pass the defendant's typing examination but the defendant had knowledge of the plaintiff's prior employer's excellent recommendation of the plaintiff's typing skills. Third, despite the plaintiff's application for the several clerk positions and his clear qualification for those positions, the proof is abundantly clear that the defendant rejected him in favor of non-black applicants. Furthermore, this Court infers racial discriminatory intent against Mr. Mosley from the defendant's failure to hire a black in any clerk position in the past even though numerous blacks have applied.

The defendant's articulated legitimate nondiscriminatory reason for not transferring the plaintiff into a clerk position was his unsatisfactory performance in the housekeeping department based on disciplinary reports filed against him. The plaintiff, however, successfully showed pretext. The proof clearly shows that the defendant evaluated the plaintiff's performance in the housekeeping department as excellent. The proof also clearly shows that the disciplinary reports filed against the plaintiff were never shown to him as required pursuant to the defendant's own policy. Moreover, the plaintiff established that the defendant's reliance on information from two black employees—Holmes and Robertson—was in error. The defendant's reliance on disciplinary reports that did not conform to the defendant's policy and that did not reflect correct information is no basis to reject the plaintiff's application for transfer. In the judgment of this Court, the defendant's articulated legitimate nondiscriminatory reasons for rejecting the plaintiff are pretext for unlawful discrimination. The evidence supporting this finding of pretext is, in this Court's opinion, also further evidence of the defendant's racially discriminatory intent against blacks; as also shown in the defendant's never previously hiring a black in a clerical position. This Court

concludes that the proof shows by a preponderance of the evidence discrimination by the defendant against Mr. Mosley.

In addition to the plaintiffs' claims of employment discrimination under Title VII, they also claim employment discrimination under Title VI, § 601, 42 U.S.C. § 2000d. That statute provides that:

No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation, in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.

Thus, the general prohibition against discrimination in Title VI applies only if a defendant receives federal funds. Claims of employment discrimination are addressed in § 604 of Title VI, 42 U.S.C. § 2000d–3, which limits the general prohibition of § 601. That section provides:

Nothing contained in this subchapter shall be construed to authorize action under this subchapter by any department or agency with respect to any employment practice of any employer, employment agency or labor organization except where a primary objective of the Federal financial assistance is to provide employment.

Although the plain language in § 604 expressly limits the authority of federal departments and agencies, it has also been consistently interpreted by the courts to limit the right to bring a private suit. In the seminal case of *Trageser v. Libbie Rehabilitation Center*, 590 F.2d 87 (4th Cir. 1978), *cert. denied*, 442 U.S. 947, 99 S.Ct. 2895, 61 L.Ed.2d 318 (1979), the Court held that § 604 of Title VI provides plaintiffs a remedy for employment discrimination by defendants receiving federal funds only when "providing employment is a primary objective of the federal aid" or the employment discrimination complained of is felt by the primary beneficiaries of the federal funds. *Id.* at 89. Although the Supreme Court has not addressed this issue, the trend among the circuit courts of appeal is to adopt the *Trageser* view. Accordingly,

the Second, Seventh, Eighth, Ninth and Eleventh Circuits have followed the Fourth Circuit's decision in *Trageser*. *Jones v. Metropolitan Atlanta Rapid Transit Authority*, 681 F.2d 1376, 1378 (11th Cir. 1982); *Scanlon v. Atascadero State Hospital*, 677 F.2d 1271, 1272 (9th Cir.1982); *Association Against Discrimination v. City of Bridgeport*, 647 F.2d 256, 276 (2d Cir. 1981); *Simpson v. Reynolds Metals Co., Inc.*, 629 F.2d 1226, 1234–35 (7th Cir.1980); *Carmi v. Metropolitan St. Louis Sewer District*, 620 F.2d 672, 674–75 (8th Cir. 1980), *cert. denied*, 449 U.S. 892, 101 S.Ct. 249, 66 L.Ed.2d 117 (1980). *But see Le Strange v. Consolidated Rail Corporation*, 687 F.2d 767 (3rd Cir.1982) (holding that the Rehabilitation Act of 1973, 29 U.S.C. § 704 *et seq.*, which incorporates Title VI discrimination standards, prohibits employment discrimination against handicapped persons by federal grantees separate from Title VI).

█ In the present case, the evidence is completely devoid of any showing that the plaintiffs are the intended beneficiaries of any federal funds. Neither is there any proof that the defendant receives federal funds, the primary objective of which is to provide employment. Moreover, the proof is wholly lacking in any showing that the employment discrimination complained of has harmed an intended beneficiary of federal funds. The proof simply fails to satisfy the standard established in *Trageser*. Accordingly, this Court concludes that the plaintiffs do not have standing to raise any employment discrimination issues under Title VI.

An appropriate ORDER will enter this day.

## ON DAMAGES AND FRONT PAY

█ Pursuant to the Memorandum and Order of March 2, 1983 finding that the defendant Clarksville Memorial Hospital discriminated on the basis of race against Donnell Richard Mosley in denying him a transfer to the position of clerk in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* and in violation of

the conciliation agreement of May 1976 between the defendant and the plaintiff Mosley, this Court hereby ORDERS as follows:

1. Based on the stipulated facts between the parties and the evidence presented at the hearing on April 6, 1983, the Court concludes that the plaintiff Mosley is entitled to backpay in the amount of $54,030.80 less the plaintiff's interim earnings of $38,016.80. Thus, the plaintiff shall receive a backpay award of $16,014.00. It is the opinion of the Court that this backpay award is justified to make the plaintiff whole and also because but for the defendant's racial discrimination the plaintiff would have received the clerkship position and remained in the continuous employment of the defendant. *See, e.g., Sangster v. United Air Lines, Inc.,* 438 F.Supp. 1221 (N.D.Cal.1977).

2. Based upon the evidence at the April 6, 1983 hearing and at the liability trial, this Court finds that the relationship between the plaintiff and the defendant has so deteriorated that reinstatement is not possible. However, this Court has discretionary equitable authority to award the plaintiff front pay. *Fitzgerald v. Sirloin Stockade, Inc.,* 624 F.2d 945, 957 (10th Cir.1980); *Thompson v. Sawyer,* 678 F.2d 257, 292–93 (D.C.Cir.1982); *Schlei & Grossman, Employment Discrimination Law* at 1398 (1983). *See generally* Note, *Front Pay—Prophylactic Relief Under Title VII of the Civil Rights Act of 1964,* 29 Vand.L. Rev. 211 (1976). It is the judgment of this Court that the plaintiff is entitled to front pay for a period of six months in lieu of reinstatement.

3. It is further ORDERED that the defendant pay the plaintiff's counsel attorney fees and costs which the parties agreed were reasonable in the amount of $15,900.00.