693 F.2d 600
 30 Fair Empl.Prac.Cas. 459,
30 Empl. Prac. Dec. P 33,155
Herbert E. BROWN, Plaintiff-Appellee,
v.
STATE OF TENNESSEE, Tennessee Department of Human Services,
Sammie Lynn Puett, Commissioner, Defendants,
Tennessee Department of Human Services, Defendant-Appellant.
 No. 81-5369.
 United States Court of Appeals,
Sixth Circuit.
 Argued June 14, 1982.
Decided Nov. 18, 1982.
 
 William M. Leech, Jr., Atty. Gen. of Tennessee, Melinda J. Branscomb, Asst. Atty. Gen., Nashville, Tenn., for defendant-appellant.
 Saul Kay, Memphis, Tenn., for plaintiff-appellee.
 Before LIVELY and JONES, Circuit Judges, and CECIL, Senior Circuit Judge.
 NATHANIEL R. JONES, Circuit Judge.
 
 
 1
 The State of Tennessee appeals the judgment for plaintiff in this Title VII sex discrimination case alleging discriminatory failure to promote Herbert Brown to the level of his female co-workers. Though affirming the primary findings of fact by the district court, we reverse because as a matter of law the district court findings establish an unrebutted legitimate nondiscriminatory reason for the dissimilar treatment of Mr. Brown.
 
 I.
 
 2
 Herbert Brown is presently and at all relevant times was employed by the State of Tennessee Department of Human Services. He was hired by the state as a senior account clerk in April 1976 in a branch office administering the food stamp program in Shelby County, Tennessee. His job duties required Brown to issue food stamps[1] as well as to supervise the other issuers in the office. Of the nearly twenty issuing clerks and supervisors in the greater Memphis, Tennessee area, Mr. Brown was the lone male.
 
 
 3
 Upon each hiring, promotion or demotion, employees automatically serve six months probation. Work is evaluated and probation may be extended but not beyond one year. Brown's probation was extended three months due to a high error rate. His nine-month probation ended in January 1977 when his performance was evaluated as marginal and in need of improvement. His error rate was the principal cause. Due to his evaluation, Brown was demoted from his position of senior account clerk to clerk II, which relieved him of his supervisory duties and triggered another six-month probation, effective February 1, 1977.
 
 
 4
 Late in January, a weekend break-in occurred at Brown's office which Brown discovered when he arrived at work the following Monday morning. He testified that his cancelled ATP cards for the prior Friday, as well as those of one co-worker, were stolen. A state witness disputed whether any of his co-workers' cards were purloined. The effect of the theft was an inability to reconcile Brown's account for the prior business day. The ATP cards had been cancelled and thus were of no street value.
 
 
 5
 The state did not call in the police and instead concentrated their investigation of the break-in internally. Several employees, including Brown, were interrogated and were requested to take a polygraph test. Brown and a woman employee, Ms. Wadley, refused. Brown testified that he was told by his immediate supervisor that no repercussions would occur if he refused. Brown once again was requested to submit to a polygraph test and again refused. Both Brown and Wadley were suspended pending their termination.[2] Ultimately the notice of termination was rescinded. Brown's six-month probationary period, which began February 1, 1977, was extended an additional six months. Wadley was demoted.
 
 
 6
 Several months later, the State Department of Human Services reorganized and consolidated several employment grades among the issuing clerks. The reorganization amounted to a promotion and the present clerks were given the opportunity to be promoted upon successful completion of an examination and on their supervisor's accepted recommendation based upon work performance.[3] Nineteen clerks were promoted and one clerk who was unsuccessful on the examination was kept on in order to fill the twenty available positions temporarily. The twentieth position was thus technically left unfilled.
 
 
 7
 Brown was not promoted although his test score was satisfactory. At first, he ascribed his dissimilar treatment to his probationary status. Later he learned that a female issuing clerk, Noel, who was on probation for reasons of a high error rate and excessive tardiness, was taken off probation early and promoted with the original group of nineteen. On receipt of this information, Mr. Brown concluded that his dissimilar treatment resulted from sex discrimination.[4]
 
 
 8
 The EEOC found reasonable cause to believe a violation had occurred. It was unsuccessful in conciliating the dispute and issued Brown a right-to-sue letter.
 
 
 9
 A relatively brief trial took place before Judge Robert McRae. Although he found the earlier automatic probation on demotion was due to Mr. Brown's error rate, Judge McRae found that the suspension and recommendation for termination, which were later rescinded, were mainly for failing to take the polygraph. Brown was qualified for the promotion since he passed the qualifying test. The court found that his record for job performance, compared to Ms. Noel's record, was not conclusively better or worse. The district court held that there was no legitimate reason to deny Brown what was given to the other employees and that his failure to take the polygraph was "an improper criteria to deprive this man of being reclassified." Appendix at 18. Thus a prima facie case was made, unrebutted by an articulation by the employer of a legitimate nondiscriminatory reason, and judgment was rendered for Brown in a stipulated monetary amount plus attorney's fees and certain ancillary relief.
 
 II.
 
 10
 Both parties argue that a part of the district court findings of fact are clearly erroneous. The state also contends that legal error requires that the verdict be rendered in its favor. The state maintains that Brown did not establish a prima facie case, and Brown argues that the district court did not hold that he was disciplined for his failure to submit to a polygraph test or that if such a finding were made it was erroneous. The state further contends that a legitimate nondiscriminatory reason was established which should have been credited by the court below.A.
 
 
 11
 Title VII applies to all discrimination in terms, conditions, privileges and opportunities for employment. See 42 U.S.C. Sec. 2000e-2. "[I]t is abundantly clear that Title VII tolerates no racial discrimination, subtle or otherwise." McDonnell-Douglas v. Green, 411 U.S. 792, 801, 93 S.Ct. 1817, 1823, 36 L.Ed.2d 668 (1973).
 
 
 12
 We have applied the four-step McDonnell-Douglas analysis to evaluate the prima facie case of discriminatory failure to promote in Abrams v. Johnson, 534 F.2d 1226, 1230-31 (6th Cir.1976). Accord Sessions v. Rusk State Hospital, 648 F.2d 1066, 1070 (5th Cir.1981); Higgins v. State of Oklahoma ex rel. Oklahoma Employment Security Comm., 642 F.2d 1199, 1201 (10th Cir.1981); see Solo Cup Co. v. Federal Insurance Co., 619 F.2d 1178, 1185-86 (7th Cir.1980).
 
 
 13
 We agree with Judge J. Skelly Wright, that:
 
 
 14
 Adjusting the McDonnell formula cases of discriminatory refusal to promote is relatively simple. Thus to make out a prima facie case the plaintiff must show that she belongs to a protected group, that she was qualified for and applied for a promotion, that she was considered for and denied the promotion, and that other employees of similar qualifications who were not members of the protected group were indeed promoted at the time the plaintiff's request for promotion was denied.
 
 
 15
 Bundy v. Jackson, 641 F.2d 934, 951 (D.C.Cir.1981).
 
 
 16
 In applying the analysis of McDonnell-Douglas v. Green to the instant promotion case, the state initially disputes the qualifications element of the prima facie case. The state contends that since Brown was on probation at the time of promotion for causes of both his February 1977 demotion and subsequent discipline growing out of the nearly contemporaneous theft, he was not qualified. The district court found that the qualifications for promotion were met by Brown due to his test score and his performance, which was comparable to that of Ms. Noel.[5] Noel was also on probation which was scheduled to extend beyond the en masse promotion date, however, she was both removed from probation and promoted on or near the dates of the general promotion. Based on this and other evidence,[6] the district court found that Brown's probationary status did not disqualify him for the July 1977 promotion.
 
 
 17
 The district court resolved conflicting evidence and found that Brown was similarly situated with regard to Noel, the other probationary employee who was promoted. On review of the evidence we have no "definite and firm conviction that an error was made" in finding Brown qualified for the promotion in July 1977. See United States v. U.S. Gypsum Co., 333 U.S. 364, 395, 68 S.Ct. 525, 541, 92 L.Ed. 746 (1948).
 
 
 18
 The district court held that the state did not articulate a legitimate nondiscriminatory reason for the disparate treatment of Mr. Brown. To the contrary, on review of the oral opinion of the district court, we find unmistakable language holding that Brown was not promoted due to his failure to take the polygraph examination. The relevant section of the oral opinion is set out in the margin.[7]
 
 
 19
 The inference that the failure to submit to a polygraph test was the cause for discipline draws much support from the record. Plaintiff's attorney established through a director of the Shelby County program, Mr. Bolton, that other than Brown's refusal to take the polygraph examination, he cooperated with the investigation. The Director of Personnel and Training for the Tennessee Department of Human Services, Mr. Chapman, testified that at the time relevant to this action the state held it permissible to discipline an employee for failing to submit to a polygraph test. Furthermore, a letter from Bolton to a superior recommended terminating Brown "based on his refusal to take the polygraphy (sic) test." Appendix at 156.[8] Finally, a female employee, Wadley, was also disciplined when she refused to submit to a polygraph examination in connection with the theft. In sum, the finding of the trial judge that the failure to take a polygraph test was the reason for Brown's dissimilar treatment is in line with the substantial weight of the evidence.
 
 B.
 
 20
 We must reverse the district court, however, since judgment for plaintiff was premised upon the erroneous view that the employer did not articulate a legitimate nondiscriminatory reason for its action. The district court held that "... punishment for not taking the polygraph test ... was an illegal--certainly not illegal--an improper criteria to deprive this man of being [promoted]."
 
 
 21
 In Texas Department of Community Affairs v. Burdine, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981), the Supreme Court recently restated its view as to acceptable reasons which rebut plaintiff's prima facie Title VII case:
 
 
 22
 We have stated consistently that the employee's prima facie case of discrimination will be rebutted if the employer articulates lawful reasons for the action; that is, to satisfy this intermediate burden, the employer need only produce admissible evidence which would allow the trier of fact rationally to conclude that the employment decision had not been motivated by discriminatory animus.
 
 
 23
 Id., at 257, 101 S.Ct. at 1095.
 
 
 24
 Chapman, the Director of Personnel and Training for the State Department of Human Services, stated: "at that time [1977] discipline was carried out and it was permissible in the program to straighten up and discipline employees, in fact, to terminate an employee for refusal to take a polygraph test." Appendix at 135. He further testified that after 1980 the state concluded that failure to submit to a polygraph examination would not subject an employee to discipline by his or her state employer. The parties do not dispute the accuracy of Chapman's statement as to the period before the change in state policy.
 
 
 25
 Several cases have approved of polygraph testing in the context of Title VII litigation. See, e.g., Ramirez v. City of Omaha, 678 F.2d 751 (8th Cir.1982) (use of admissions made during a polygraph examination as a factor in an employment decision held nondiscriminatory in an impact case); United States v. City of Miami, 614 F.2d 1322, 1346 (5th Cir.1980) (consent decree upheld which allowed polygraph use for applicants to positions of trust when only job-related questions are posed and when polygraph results may not be the sole qualifying factor), other holdings modified en banc, 664 F.2d 435 (1981); Johnson v. Georgia Highway Express, Inc., 5 EPD p 18,444 (N.D.Ga.1972) (polygraph use is a permissible testing device for discipline in a disparate treatment action).
 
 
 26
 We hold that, at least when polygraph testing is a lawful method for determining employment-related questions, as it was in Tennessee, the failure to submit to an examination on the employer's permissible request may be a legitimate nondiscriminatory reason for dissimilar treatment, which rebuts the prima facie case of plaintiff.[9] Of course, plaintiff still retains the opportunity to demonstrate that the employer's proffered reason is a pretext for discrimination, and plaintiff must be afforded a full and fair opportunity to offer evidence on that question. See Burdine, supra 450 U.S. at 255-56, 101 S.Ct. at 1094-1095.
 
 
 27
 The trial judge rested his holding upon the lack of a legitimate nondiscriminatory reason; however, plaintiff was not limited in presentation of proof of discrimination. Plaintiff was allowed an opportunity to rebut the state's articulated reasons. Any lingering doubt we might have that the district court could find that a reason for dissimilar treatment was sex discrimination, notwithstanding the polygraph testing related discipline, is dispelled by the district court's oral holding, wherein the judge stated in effect that no intentional discrimination was proven.[10] Accordingly, we find that the district court considered and rejected pretext evidence, resting its holding upon the failure of defendant to articulate a legitimate nondiscriminatory reason. In light of Burdine, we must hold that the district court's judgment was in error as a matter of law. For that reason, the judgment of the district court is REVERSED.
 
 
 
 [1]
 During 1976 and 1977, food stamps were issued to qualifying individuals upon the submission of an authorization to purchase an (APT) card and a specified sum of money. As their titles reveal, the issuing clerks would receive the ATP cards and cash and, in return, issue the food stamps. The ATP cards were cancelled and retained for the purpose of reconciling the amount of cash collected daily. This accounting was performed on the following business day. The frequency of imbalanced accounts and the amount of the imbalance was denominated the "error rate" of the individual issuing clerk
 
 
 [2]
 The other female employees were disciplined contemporaneously with this incident, however, the reasons for discipline of these women were not developed in the record
 
 
 [3]
 While this procedure was the subject of some dispute at trial, the disputed issues are not relevant to our disposition
 
 
 [4]
 Brown received his promotion in May 1978, some ten and one-half months after his co-workers. He received good reports on his work in 1978 and 1979 and received a commendation in 1980
 
 
 [5]
 We do not mean to imply that plaintiff must prove his qualifications compared favorably to other promoted employees so long as the proof supports the conclusion that the plaintiff was qualified according to the legitimate criteria disseminated by the company or as found by the district court. See Bundy v. Jackson, 641 F.2d at 951
 Unlike certain demotions, this is not a case where an employee was presented with adverse evidence which left unexplained, subjected the employee to discipline. See Potter v. Goodwill Indus. of Cleveland, 518 F.2d 864 (6th Cir.1975); Long v. Ford Motor Co., 496 F.2d 500 (6th Cir.1974). Without such an explanation, the showing by plaintiff of qualifications for promotion and the existence of an unfilled position dispels these two most common legitimate competing inferences to the inference of discrimination. "Elimination of these reasons for the refusal to hire is sufficient, absent other explanation, to create an inference that the decision was a discriminatory one." Teamsters v. United States, 431 U.S. 324, 358 n. 44, 97 S.Ct. 1843, 1866 n. 44, 52 L.Ed.2d 396 (1977). Among other attributes of this formulation for the prima facie case, it places upon the company, which is in the superior position with respect to access of information, the burden of articulating the until-then unstated legitimate reasons why the applicant was not promoted. See id. at 359 n. 45, 97 S.Ct. at 1866 n. 45; Flowers v. Crouch-Walker Corp., 552 F.2d 1277, 1282-83 (7th Cir.1977). In contrast, a showing by plaintiff that similarly situated employees of the alleged preferred race or sex were promoted, even though their records contained the same reason which the employer articulated to rebut the initial presumption, would be particularly powerful evidence of pretext. See McDonnell-Douglas v. Green, 411 U.S. at 804, 93 S.Ct. at 1825.
 
 
 [6]
 On cross examination, the assistant director of the Shelby County program, Mr. Bolton, virtually admitted that, apart from the polygraph incident, Brown and Noel were similarly situated with respect to their employment condition at the time of the promotion. Further, Brown testified that an employee could be promoted while on probation. A state witness, Bob Chapman, disputed this testimony
 
 
 [7]
 In pertinent part, the oral opinion reads as follows:
 It is also true that in early 1977 he was demoted from that supervisory position and he was demoted because of his error rate. At about the same time there occurred a break-in--there was reported a break-in that occurred at the office where he was a supervisor and he was recommended for termination for not taking a polygraph test. His error rate was a factor earlier, but this caused him ultimately to be put on extended probation for failure to take the polygraph.
 Then, when July came along he took the test, he passed it, and was altogether qualified except for this discipline that had been dispensed because he had not taken the polygraph.
 Now, the proof is not conclusive about Ms. Noel's record being that much better than his. And Ms. Armstrong, who apparently got the promotion temporarily anyway, didn't pass the test.
 So, the court finds that the defendant has not articulated a legitimate reason for not giving him this reclassification that was given to everybody, particularly Ms. Noel, who was also on probation until they determined that she ought to be given this new status and they took her off probation.
 Well, there is no reason in the world why they couldn't have done that for him except for the fact that he was still being punished for not taking the polygraph test. And the court believes that that was an illegal--certainly not illegal--an improper criteria to deprive this man of being reclassified. Appendix at 18 (emphasis added).
 
 
 [8]
 The interoffice correspondence pertinently sets forth the motivations of the Shelby County officials for disciplining Mr. Brown:
 The latter part of January 1977, it was reported to our Internal Auditor that several transacted ATP cards were missing at the North Branch Food Stamp Office. As a result of those missing ATP cards, a polygraph test was administered to several employees of which Mr. Brown was to have been included. Based on the Internal Auditor's report Mr. Brown refused to take the polygraph test.
 On 4/14/77, Mr. Brown was advised that he was being suspended pending a notice of termination. Mr. Brown was asked again on that date whether or not he would be willing to take the polygraph test in relation to the missing ATP cards. Mr. Brown stated again that he would not be willing to submit to the polygraph test. Based on his refusal to take the polygraphy (sic) test, in relation to the missing ATP cards, it is recommended that Mr. Brown not be given permanent Civil Service status in the Clerk II position, rather that he be terminated effective immediately.
 Appendix at 156.
 
 
 [9]
 We need not decide whether a reason prohibited by a state or federal law unrelated to discrimination by race, color, religion, sex or national origin may be a legitimate nondiscriminatory reason for Title VII purposes since the parties do not dispute that Tennessee law did not prohibit discipline for failing to take the polygraph test. But see, e.g., Cal.Lab Code Sec. 432.2 (no employer shall require an employee to submit to a polygraph test as a condition of employment); N.J.Stat.Ann. Sec. 2A:170-90 (employers shall not influence, request or require such tests as a condition of employment)
 
 
 [10]
 In pertinent part, the court stated:
 I cannot find that there was any conspiracy by females or males to benefit females of an intentional nature.
 Appendix at 19.