Wanda SMITH, Plaintiff,

v.

CITY OF DAYTON, Defendant.

No. C–3–89–461.

United States District Court,
S.D. Ohio, W.D.

May 28, 1993.

Elaine S. Bernstein, Jeffrey M. Silverstein, Dayton, OH, for plaintiff.

Jane M. Lynch, Freund, Freeze & Arnold, Dayton, OH, for defendant.

## DECISION AND ORDER FOR JUDGMENT

MERZ, United States Magistrate Judge.

Plaintiff, Wanda Smith brought this action against her employer, Defendant City of Dayton pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. Sec. 2000e, *et seq.* alleging that Dayton discriminated against her on the bases of race and sex when it failed to promote her to the rank of Major in the Dayton Police Department in December, 1987, and that the City retaliated

against her in violation of Title VII when, in June, 1990, it again failed to promote her to Major.[1]

The parties consented to full Magistrate Judge jurisdiction, the matter was tried to the Court on November 4, 5, 6, 7, and 8, 1991, and the case is before the Court for decision on the merits. Pursuant to Fed. R.Civ.P. 52, the Court's findings of fact and conclusions of law are embodied in the following opinion.

Plaintiff, a white female, received her bachelor of science degree in law enforcement with a minor in political science from Eastern Kentucky University in May, 1975. (Trial Transcript, Vol. II at 16–17).[2] Immediately upon her college graduation, Smith moved to Dayton, *Id.* at 17, where she attended the Dayton Police Academy, graduating in April, 1976. *Id.* at 18. Smith's first assignment was as a police officer in the Fifth District where she remained until she was promoted to sergeant in July, 1980. *Id.*

In the Dayton Department, promotions to sergeant and lieutenant are pursuant to written competitive examinations given by the Dayton Civil Service Board. Vol. I at 92. This procedure is required by the Dayton City Charter. The examinations result in a list of eligible candidates and the Department is required to use the "rule of one" under which the top person on the list is promoted first, the second person is promoted next, and so forth. *See Campbell v. City of Dayton,* Case No. C–3–89–098 (Decision and Entry of December 9, 1991).

After her promotion to sergeant, Smith worked for a short period of time in the Third District and then was transferred to the Central Business District. *Id.* at 20. As a sergeant in the Central Business District, she supervised between five and fifteen people on the day shift. *Id.* at 21–22.

In August, 1985, Smith was promoted to lieutenant, again pursuant to written competitive examination. *Id.* at 25. Her first assignment was as a field lieutenant for the

---

1. Smith also made claims pursuant to 42 U.S.C. Sec. 1983, and the laws of the State of Ohio. However, District Judge Walter Herbert Rice granted summary judgment in favor of Dayton with respect to these claims. (Doc. 37).

2. Hereinafter, references to the Trial Transcript will be by Volume number.

Third and Fifth Districts and her duties included directly supervising all major incidents that occurred in the City as well as responsibility for all the personnel who were working during her evening shift. *Id.* at 26. From March, 1986, until December, 1987, Smith worked with Major Phyllis McDonald on special projects. *Id.* at 36. In July, 1988, Smith was assigned to the Investigations Bureau where she supervised that unit comprised of approximately twenty (20) to twenty-five (25) individuals. *Id.* at 27, 28, 74, 75. Smith held that position until June, 1990. *Id.* at 78. At that time, after she applied unsuccessfully for one of the Major positions in suit, she was named commander of the Second District. Because she was displeased with that assignment, she was transferred back to investigations in October, 1990.

In the late summer or early fall of 1986, Smith was appointed to the wage negotiating team. *Id.* at 28. The wage team was responsible for putting together a package for purposes of bargaining with the City with respect to supervisors' wages. *Id.* at 29. The team also participated in the negotiating of the supervisors' first contract with Dayton. *Id.* at 29–30. In December, 1989, Smith was elected to the Supervisor's Committee. *Id.* at 186. She served as chairman of that committee until the president of the Fraternal Order of Police disbanded the committee in June, 1990. *Id.* The Supervisors' Committee, formed by the FOP, was a group of supervisors in the department who represented to the City the viewpoints and the best interest of the supervisors. Vol. I at 167.

Smith has been involved with the Common Heritage Mountain Days with her family, a Civil War re-creation group which meets primarily in Springfield. Vol. II at 97; 156. Smith is also active in her daughter's school which is located in Huber Heights. *Id.* at 156. (At the time her daughter reached school age, Lt. Smith moved from a residence in the heart of the Fifth District to a location on the outskirts of Dayton not served by the Dayton School District.)

Since at least 1972 the City of Dayton has assiduously attempted, by many means, to increase the number of black officers in the Police Department and to promote already employed black officers to supervisory positions. *See State, ex rel. FOP, v. Dayton,* 49 Ohio St.2d 219, 361 N.E.2d 428 (1977). Those efforts which involved attempts to avoid use of civil service and the "rule of one" up through the rank of lieutenant have been successfully opposed by the Fraternal Order of Police. *See State, ex rel FOP; Spencer v. Dayton,* 44 Ohio App.2d 236, 337 N.E.2d 646 (1975); *FOP v. Dayton,* 35 Ohio App.2d 196, 301 N.E.2d 269 (1973).

Selection of the command staff (Majors and the Deputy Chief/Lt. Colonel [3]), however, has long been the personal prerogative of the Chief of Police, subject to approval of the number of command officers by the City Manager and ratification of the persons appointed to those ranks. Vol. I at 69.

In the summer of 1987, there was a great deal of public controversy over the performance of then-Chief of Police Tyree Broomfield. Chief Broomfield was the first black man to serve in the Dayton Police Department above the rank of sergeant. He had been hired by the Department as a civilian specialist in conflict management and then brought into the uniformed ranks as a major. He was later promoted to Lieutenant Colonel and made Deputy Chief to Police Chief Grover O'Connor. When O'Connor retired, he was made Chief.

Many members of the Fraternal Order of Police were resentful at being commanded by a Chief who had not come up through the ranks.[4] Chief Broomfield's popularity was not helped by his appointment of two Majors from outside the Department: Major Edward Long who had been a captain of detectives in Atlanta and Major Phyllis McDonald who had no prior sworn police experience at all. The performance of these two persons was a central feature of the 1987 controversy surrounding Chief Broomfield, who at one

---

**3.** No one has held the rank of captain in the Dayton Police Department for many years.

**4.** The historical matters recited here as background are generally known in Dayton and therefore proper matter for judicial notice under F.R.Evid. 201.

point fired them and then rescinded his decision to do so. *Dayton Daily News,* September 28, 1987, page 6. At one point deceased former State Representative C.J. McLin, at that time the most prominent and powerful elected black official in the State of Ohio, led an angry crowd of 300 black citizens to a City Commission meeting to protest the firings of McDonald and Long, apparently believing that it was forced upon Chief Broomfield and was preparatory to firing him. *Dayton Daily News,* September 21, 1987, page 1. Weighing in on opposite sides of the controversy, the FOP took a vote of no confidence in Chief Broomfield and the Black Police Association labeled the FOP action "racist." *Dayton Daily News,* September 27, 1987, page 1.

The City negotiated a settlement with Chief Broomfield, who then resigned in early December. James Newby, then Lt. Colonel and Deputy Chief, learned sometime in October that he would be appointed Chief when Broomfield resigned. Chief Newby's initial intentions were to promote Lt. Virgil McDaniel to Deputy Chief and Sgt. Ronald Lowe to Major with the functional assignment of superintendent of administrative services. Vol. I at 23. McDaniel and Lowe are both male veterans of the Department, McDaniel being white and Lowe being black.

McDaniel was raised in West Dayton, and graduated from Roosevelt High School. *Id.* at 173. He joined the Dayton Police Department in 1967 and received an associate degree in police administration from Sinclair College in 1975 and a bachelor's degree in police administration from the University of Dayton in 1978. *Id.* In the early 1980's McDaniel was assigned to the Third District as a sergeant and/or a lieutenant; as lieutenant he served as Third District Commander. *Id.* During the five (5) year period immediately preceding his promotion to major, McDaniel assisted in founding the Kings and Queens Citizens Band Radio Club, which is a CB club to combat crime in West Dayton. *Id.* at 173–74. McDaniel also was a founder of the charter amendment for the Roosevelt Alumni Association, and often served on councils for the Innerwest and Southwest Priority Boards' councils. *Id.* He was the

first Dayton police officer to serve on the board of directors of project CURE, and in 1985, he was elected to serve as police trustee for the State of Ohio on the Police and Fire Disability Fund. *Id.* McDaniel has been active with the East Dayton Optimist, belongs to the John Durts Lodge of the Key Masons, and to the Shriners. *Id.* at 174–75. McDaniel founded the first special off-duty effort by uniformed police officers to interact with the Special Olympics and has been active in the local FOP. *Id.; Id.* at 188. McDaniel has also served as the president of the state FOP. *Id.* at 165. In 1977 he was awarded the Department's highest award for valor, the Distinguished Service Medal.

Lowe was appointed as a Dayton police officer in 1974, and was promoted to the rank of sergeant in 1983. *Id.* at 202. As a sergeant, Lowe initially worked for approximately six months as first relief sergeant in the Fifth District which involved supervising approximately twelve (12) officers. *Id.* at 203. He was then transferred to professional standards as the administrative aide to the major in charge of that division, a position he held for three years. *Id.* at 203–05. An administrative aide is a person who sees to it that things within the division to which he or she is assigned are coordinated, who handles many personnel matters for a major, and who keeps the major apprised of what is taking place. *Id.* at 24.

Lowe became aware sometime in 1987 that he was a candidate for the position of major. *Id.* at 221. Lowe believed that he was being chosen because of the respect and knowledge that he had for the community. *Id.* at 225. Lowe was an honor graduate of, and star athlete at, Dunbar High School, he testified he knew most of the community, specifically the Black community, and was active in churches. *Id.* at 225–26. Lowe does not have an associate or bachelor's degree. *Id.* at 220. However, he has graduated from the FBI academy, and the Police Executive Leadership Council of Ohio State University. *Id.*

Under Newby's initial plan, the command staff would have consisted of himself, McDaniel, and three Majors: Long, McDonald, and Ronald Labatzky, a white male.

Black leaders, particularly State Representative McLin, were unwilling to accept this diminution of black representation in the command staff and insisted that the top two positions could not be filled with whites. *Dayton Daily News,* December 6, 1987, page 1. Col. Newby then announced he would leave the deputy spot vacant for the time being and promoted only Lowe. *Dayton Daily News,* December 10, 1987, page 1. In taking over as Chief, Col. Newby opined "It is absolutely essential that we bring racial peace and parity to this organization."

Lowe's promotion to Major was effective on December 7, 1987. Vol. I at 230. Lowe remained in the position of superintendent of administration for only about two (2) weeks at which time Newby transferred him to professional standards. *Id.* He there filled the vacancy left by the unexpected resignation of Phyllis McDonald. Lowe held that position from late December, 1987, until June or July, 1990. *Id.* at 36. Virgil McDaniel was promoted to Major on December 22, 1987, to fill the vacancy at that rank. Vol. I at 62. Functionally, he became superintendent of operations, a position previously held by Newby himself.

At the time of both the Lowe and McDaniel promotions, there were no job descriptions for the positions they were to fill (Vol. I at 29) nor was there any application process, formal or informal. Col. Newby apparently felt he knew the personnel in question and what he wanted in the command staff well enough to make those choices on his own without any formal process. He testified at trial that, as compared with Smith, he considered Lowe better known in the community, more open with people in the department, more concerned, and a harder worker with respect to bringing about a consensus within the department as opposed to division. Vol. I at 41. In making the decision to promote McDaniel, Newby testified he felt that McDaniel was well known in the community, and that he had displayed superior leadership ability by virtue of his being elected president of the state FOP and being elected

as representative to the State Police and Fire [Disability Fund]. *Id.* at 40.

In 1990, Newby anticipated the need for three more Majors in the Department. *Id.* at 49. In addition, due to the resignation of Major Long, Newby was in the position of selecting four new Majors. *Id.* at 49–50. The position descriptions for the positions that the newly appointed Majors would fill each had the same background requirements: bachelor's degree and three (3) years of police department management experience or ten (10) years police experience, currently in a supervisory capacity. *Id.* at 53. About fifty (50) people, including Smith, applied for the positions. *Id.* at 54. Newby testified he did not promote Smith to Major because he thought that she needed to get more community experience, she tended to be divisive, and she needed to become more involved in work within the department and out in the community. Vol. III at 151.

Newby appointed Dallas Hill, a black male sergeant, to the position of superintendent of professional standards; Jaruth Durham–Jefferson, a black female sergeant, to the position of superintendent of community relations; John Thomas, a white male lieutenant, to the position of superintendent of special investigations, and Gerald Morgan, a white male lieutenant, to the position of superintendent of investigations. Vol. I at 54. McDaniel was promoted to Lieutenant Colonel and made Deputy Chief. After these promotions were completed, Chief Newby had achieved the racial parity at the level of Major which he had promised: Labatzky, Morgan, and Thomas were white; Lowe, Durham–Jefferson, and Hill were black. As of this point in time there had still never been a black lieutenant.[5] Thus if Chief Newby were going to appoint any new black Majors, he had to appoint them "over the heads" of all the lieutenants.

Dallas Hill has lived in Dayton since the late 1940's, and he completed his high school education in Dayton. Vol. III at 5, 19. He joined the Dayton police force in June, 1961, and was promoted to the rank of sergeant in December, 1989. *Id.* at 5, 3. Since the early

5. Subsequently, Sergeant Steve Miller was promoted to Lieutenant through the Civil Service process, becoming the first black lieutenant in the Dayton Police Department's history.

1980's Hill was primarily assigned to the polygraph department where his duties were administering polygraph tests, analyzing the results, and at times, testifying in court. *Id.* at 4, 5. Hill had been a sergeant for a little over six months when he was promoted to major. *Id.* at 3–4. During his employment in the polygraph department, on occasions Hill went out into the community, but only in a job-related sense. *Id.* at 7–8. Community activity and involvement and personnel evaluations were not requirements of his job as a polygraphist. *Id.* at 8. However, Hill did have contact with law enforcement officials all over the county, judges, and federal personnel. *Id.* at 12. As a polygraphist, Hill received several commendations with respect to his work. *Id.* at 15–19. Hill is a member of Mount Calvary Baptist Church in Dayton. *Id.* at 19.

Jaruth Durham–Jefferson became a Dayton police officer in 1974, received a bachelor's degree from Wright State University in 1983, and was promoted to the rank of sergeant in 1986. Vol. IV at 60, 65–66. At the time she was promoted to sergeant, Jefferson was working as Chief Broomfield's administrative aide. *Id.* at 61. Not surprisingly, she was a strong supporter of Chief Broomfield and said publicly in the fall of 1987 that she would never work with Newby. In December, 1987, Jefferson became the supervisor of the crime prevention unit where she was responsible for seven different programs. *Id.; Id.* at 67. Jefferson had no street experience as a sergeant. *Id.* at 60. However, as head of the crime prevention unit, she directly supervised eleven (11) people and was responsible for the civilians who act as neighborhood assistance officers. *Id.* at 62. While Jefferson was responsible for the crime prevention unit, that unit won several awards. *Id.* at 73. Jefferson also received several personal commendations. *Id.* at 74–81. Jefferson was still with the crime prevention unit when she was promoted to Major. *Id.* at 63. As a matter of community involvement, Jefferson has belonged to the county-wide Sexual Child Abuse Neglect Board, the Dayton Public School Career Academy advisory board, the Job Corps advisory board, the Eastway Mental Health Center's board as a director, the National Coun-

cil of Negro Women, Civitan, and numerous other organizations. *Id.* at 71.

John Thomas has lived in Dayton since 1973, became a Dayton police officer in 1974, was promoted to sergeant in 1978, and to lieutenant in 1988. Vol. III at 26. Thomas is a high school graduate but does not have an associate degree or a bachelor's degree. *Id.* However, he is a graduate of the FBI Academy and has between 78 and 80 credit hours from Sinclair Community College and the University of Virginia in the field of law enforcement. *Id.* at 35. In his position as sergeant, Thomas served as administrative aide to the superintendent of the operations division. *Id.* at 28. As a lieutenant, Thomas served as commander of the Third District and was also a commander of the hostage negotiations team. *Id.* at 27. When he served as commander of the Third District, Thomas attended meetings of the administrative councils of the Southwest and Innerwest Priority Boards, and from time to time would attend the full meetings of those boards. *Id.* at 29–30. Thomas was a member of the supervisor's committee from March, 1988, through September, 1989. *Id.* at 31.

Jerry Morgan became a Dayton police officer in July, 1961, and he served as a patrol officer in the Third District and First District for approximately three (3) years. *Id.* at 68; 74. Morgan was then assigned to the detective section where he worked robbery, burglary, fugitive, and larceny. *Id.* at 74. He was promoted to sergeant in 1977, and for a period of time worked as a street supervisor. *Id.* at 69, 74. Morgan then served as administrative assistant to the operations superintendent. *Id.* at 74. Morgan was promoted to lieutenant in 1977. *Id.* at 68; 75. He worked as night lieutenant for approximately two (2) years, then was in charge of the police academy for about four or five years. *Id.* at 75. Morgan next served as commander of the Second District, a position which he held for about eight and one-half (8½) years). *Id.* at 75–76. Morgan was also promoted to Major in June, 1990. *Id.* at 69.

During the time he was commander of the Second District, Morgan attended meetings

of the Southeast Priority Board at least monthly. *Id.* at 72. Morgan has also served as a committee member or advisor to numerous committee groups including Walnut Hills, South Park, Brown Street Business Association, Belmont Business Association, and Eastmont Neighborhood Association. *Id.* at 76. Morgan has also been a member of the administrative council for the Southeast Priority Board, the off campus advisory committee and the special events committee for the University of Dayton, the Montgomery County Animal Shelter, and a board member of the Southeast Dayton Optimist Club. *Id.* at 76–77. Morgan has an associate degree and is approximately fifteen to seventeen credit hours short of obtaining a bachelor's degree. *Id.* at 76.

### THE 1987 RACE AND SEX DISCRIMINATION CLAIMS

In Counts One and Two of the Complaint, Plaintiff claims that Dayton discriminated against her on the basis of her race and sex when it did not promote her to Major in December, 1987. (Final Pretrial Order Doc. # 39, p. 2).

Title VII reads in relevant part:

**Sec. 2000e–2. Unlawful employment practices**

(a) It shall be an unlawful employment practice for an employer—

(1) to ... discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, ... [or] sex ...

■ In a Title VII case for race or sex discrimination, the plaintiff bears the initial burden of establishing a *prima facie* case by a preponderance of the evidence. *Ang v. Procter & Gamble Co.,* 932 F.2d 540, 548 (6th Cir.1991), *citing, McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973). To establish a *prima facie* case of discrimination in a failure to promote context, a plaintiff must prove: 1) she belongs to a protected group; 2) she was qualified and applied for the promotion; 3) she was considered for and denied the promotion; and 4) other employees of similar qualifications who were not members of the protected group were indeed promoted at the time plaintiff's request for promotion was denied. *Brown v. Tennessee,* 693 F.2d 600, 603 (6th Cir.1982), *citing, Bundy v. Jackson,* 641 F.2d 934, 951 (D.C.Cir.1981).

■ If the plaintiff successfully proves a *prima facie* case, the burden shifts to the employer to articulate some legitimate, non-discriminatory reason for the adverse employment action. *McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. at 1824. Once the employer carries this burden, the burden shifts back to the plaintiff to prove by a preponderance of the evidence that the legitimate reasons offered by the employer were not its true reasons, but were a pretext for discrimination. *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 253, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1981).

■ Title VII prohibits racial discrimination against all groups. *Murray v. Thistledown Racing Club, Inc.,* 770 F.2d 63, 67 (6th Cir.1985), *citing, McDonald v. Santa Fe Trail Transportation Co.,* 427 U.S. 273, 276, 96 S.Ct. 2574, 2576, 49 L.Ed.2d 493 (1976). As with the minority plaintiff, the majority plaintiff who asserts a claim of racial discrimination in employment does so within the historical context of the Act. *Murray, supra.* "Reverse discrimination" claims require application of a *McDonnell Douglas* standard, modified to reflect this context as well as the factual situation of the claim. *Id.*

■ The "reverse discrimination" plaintiff bears the burden of demonstrating that [she] was intentionally discriminated against "despite [her] majority status". *Id.* (citations omitted). A *prima facie* case of "reverse discrimination" is established upon a showing that "background circumstances support the suspicion that the defendant is that unusual employer who discriminates against the majority" and upon a showing that the employer treated differently employees who were similarly situated but not members of the protected group. *Id.* (citations omitted).

■ Title VII, of course, does not abrogate an employer's traditional right to choose freely among qualified candidates. *Burdine,*

450 U.S. at 259, 101 S.Ct. at 1096. While the use of subjective criteria is permissible in the selection of persons to fill management positions, the ultimate issue is whether subjective criteria were used to disguise discriminatory action. *See, Grano v. Dept. of Development of the City of Columbus*, 699 F.2d 836, 837 (6th Cir.1983); *Farber v. Massillon Board of Education*, 917 F.2d 1391 (6th Cir.1990), *cert. denied*, —— U.S. ——, 111 S.Ct. 2851, 115 L.Ed.2d 1019 (1991).

There is obviously a grave difference of opinion between Lt. Smith and Chief Newby, and among many others, about what qualifies a person to be a Major in the Dayton Police Department.

As the very titles of the ranks imply, the Dayton Department is, as is typical in this country, paramilitary in organization. Sergeants and Lieutenants appear to have successively greater amounts of supervisory responsibility as they progress. Lt. Smith apparently believes this steady progression is a necessary qualification for service in the command staff. Vol. II, pages 221–222.

On the other hand, some staff functions which obviously do not require supervisory skills apparently are assigned to persons with the rank of sergeant or above apparently because of the rank of the officer being assisted, e.g., Sgt. Jefferson's and Sgt. Lowe's work as administrative aides to Chief Broomfield and Major McDonald and Lt. Smith's own "special projects" work for Major McDonald.

Obviously there are also major differences of opinion about the importance of formal education for these positions or indeed for police work at all. Majors Lowe and Morgan and Lt. Col. McDaniel began their police careers with only high school diplomas, Major Morgan following his father's career on the force. Lt. Smith, on the other hand, came to the force with a bachelor's degree already in hand. Of what importance is a formal degree in police training important to successful performance of the job? The evidence offers no assistance on this point.

In his testimony, Col. Newby placed great importance on the fact that Lowe and McDaniel "knew the community," but he was no clearer in his detailing of this criterion at trial than he had been on deposition. (See Judge Rice's Decision overruling the Defendant's Motion for Summary Judgment, Doc. #37.) Lt. Smith had a great deal more street supervisory experience than Lowe, but it appears Chief Newby was concerned about community involvement apart from work.

Although Col. Newby attempted at trial to downplay Ronald Lowe's race as a factor in the decision, it is clear to the Court that being black was an absolute requirement for whoever was first appointed as a Major after Broomfield resigned. In other words, race was the principal reason why Ronald Lowe was chosen over everyone else except his fellow black sergeants. Newby had essentially admitted this at a meeting at McDaniel's house with some of the more vocal Lieutenants before he became Chief. Newby's initial plan was to have McDaniel as his deputy and to promote McDaniel to Major. When this plan ran afoul of demands of black civic leaders, he backed off, promoting only Lowe. When McDonald unexpectedly resigned two weeks later, he immediately moved Lowe into her functional position and promoted McDaniel, thereby achieving the most he could at that time of his own command staff plan.

In considering Ronald Lowe's race as a "plus," Col. Newby testified he was relying in part on the City of Dayton's Affirmative Action Plan. Vol. I at 34. Thus the Plan was essentially offered as a defense for deliberately choosing someone on the basis of race.

> In order for a race or sex based remedial measure to withstand scrutiny under the fourteenth amendment there must first be some showing of prior discrimination by the governmental entity involved, and second, the remedy adopted by the state must be tailored narrowly to achieve the goal of righting the prior discrimination.

*Conlin v. Blanchard*, 890 F.2d 811, 816 (6th Cir.1989), *citing Wygant v. Jackson Board of Education*, 476 U.S. 267, 274, 106 S.Ct. 1842, 1847, 90 L.Ed.2d 260 (1986). The rule is the same for private and public employers, and sex and race based preferences are to be judged by the same standards. *Johnson v.*

*Transportation Agency, Santa Clara County,* 480 U.S. 616, 107 S.Ct. 1442, 94 L.Ed.2d 615 (1987). A statistical showing of a manifest imbalance disfavoring minorities or women in traditionally segregated job categories is sufficient to support an affirmative action plan; the employer need not admit prior discrimination, since the imbalances may have been caused by societal factors beyond its control. *Id.*

■■■ Most litigation involving affirmative action plans has involved challenges to their validity, but this is not such a case. The City's Affirmative Action Plan for 1984 through 2000 was introduced in evidence as Plaintiff's Exhibit 2. Plaintiff in no way claimed that the Plan was not supported by appropriate findings of "manifest imbalance" or was not sufficiently narrowly tailored to remedy that problem.

The Plan embodies the findings that women are significantly underutilized[6] at the white collar level (comprising only 13.9% of employees in that category) and blacks are extremely underutilized (comprising only 8.2%) (PX 2, p. 5). Thus promotion of either a black person or a female to either of the Major positions in December, 1987, would have constituted progress toward the goal. (Specific goals for each year for the Department of Police appear at PX 2, p. 28). The Plan purports to address the underutilization of women as well as blacks in white collar positions, and the Police Department is a striking example of such underutilization of women in command.

As a matter of selection procedure, the Plan provides:

> While no applicant should ever be accepted or rejected for employment or promotion based solely on race or gender, the City recognizes Affirmative Action as a moral and legal responsibility. The race or sex

of an applicant is a legitimate factor to be considered in selecting appointees to positions where demographic categories are underutilized **from a group of candidates with nearly equal qualifications.** (Emphasis added.)

There is no basis in the record before this Court for finding that Wanda Smith and Ronald Lowe were nearly equally qualified for the rank of Major in December, 1987, according to any objective qualification standards. As a matter of formal education, Smith had a bachelor's degree in law enforcement and Lowe had no post-high school formal training.[7] Lowe had six months street supervisory experience; Smith had five years as a sergeant and between seven and eight months as field lieutenant; both had significant "inside" staff experience. The Court concludes that applying the City's Affirmative Action Plan would not justify choosing Ronald Lowe over Wanda Smith for the first Major position in December, 1987, at least in the absence of better articulated standards of qualification.

■■■ Since race was a factor in the choice of Ronald Lowe and that choice cannot be justified by reference to the City's Affirmative Action Plan, the City would be liable to Lt. Smith under Title VII for Col. Newby's choice of Lowe unless the City can establish by a preponderance of the evidence that, even if race had not been considered, Lt. Smith would still not have been promoted. *Price Waterhouse v. Hopkins,* 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989); *Mt. Healthy City School Dist. Bd. of Education v. Doyle,* 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977); *Goostree v. Tennessee,* 796 F.2d 854 (6th Cir.1986), *cert. denied,* 480 U.S. 918, 107 S.Ct. 1374, 94 L.Ed.2d 689 (1987).[8]

---

6. The Plan's goal is "By January 1, 2000, the City of Dayton Municipal Government will employ a workforce which reflects the demographic composition of the population, working or seeking employment, of the City of Dayton." (PX 2, p. 1). Presumably, "underutilized" means presently employed in a proportion less than that which would reflect the demographic composition.

7. Lowe's training at the FBI Academy came after his promotion to Major.

8. Section 107 of the Civil Rights Act of 1991 changes this rule by providing that, upon proof that race was a motivating factor in the decision, unless the decision is justified by an affirmative action plan, proof that the employment decision would have been made anyway does not negate a Title VII violation, but merely limits the plaintiff's remedies. However, the 1991 Act is not retroactively applicable. *Vogel v. Cincinnati,* 959 F.2d 594 (6th Cir.1992).

This Court is persuaded, by a preponderance of the evidence, that Col. Newby would not have chosen Wanda Smith over Ronald Lowe even if race had not been a factor in Major Lowe's promotion. Newby testified that he perceived Lt. Smith as a divisive influence in the Department and this observation was corroborated by other testimony regarding her involvement with the Supervisors' Committee, which was eventually abolished by FOP President Tom Bennett because of the dissension it apparently caused.

This reason is not extremely strong, nor were its contours completely fleshed out by Chief Newby. It is a sufficiently subjective criterion that, if Lowe and Smith had been the only qualified applicants in the selection pool, the Court would have a hard time crediting it on the present record. However, Lowe and Smith were not the only qualified applicants in the pool. Even if the pool were limited to then-existing lieutenants, there were others with equal or greater experience than Smith and without this particular problem. Putting it another way, Lt. Smith was not a clear first choice if racial preference were eliminated.

As noted above, the use of subjective criteria requires close examination, but is inevitable when high level professional or managerial positions are being filled. Particularly in a situation such as this when the director of a department which is riddled with racial and labor tension is choosing a management team, wide latitude must be allowed for the operation of personality factors; cohesiveness of a management team is not an unimportant consideration.

The Court concludes that Chief Newby did not intentionally discriminate against Lt. Smith on the basis of race or sex when it selected Ronald Lowe instead of her for the first promotion to Major in December, 1987.

Likewise, the Court concludes there was no intentional sex discrimination in the choice of Virgil McDaniel for the second Major promotion. While Lt. Smith has made a *prima facie* case on this promotion, Col. Newby's articulated reasons for preferring McDaniel to others who were qualified—demonstrated leadership as State FOP President and more familiarity with the community—are clearly

not pretextual. McDaniel had served as a District Commander, an extremely important position under Dayton's district policing plan.

Plaintiff having failed to prove intentional discrimination on either Count One or Count Two, those Counts of the Complaint must be dismissed with prejudice.

**THE 1990 RETALIATION CLAIM**

In Count Three of the Complaint, Plaintiff alleges that Dayton's failure to promote her to Major in 1990 was in retaliation for her having filed a claim with the OCRC for the failure to promote in 1987. (Final Pretrial Order Doc. # 39, p. 2).

Title VII reads in relevant part:

**Sec. 2000e–3. Other unlawful employment practices**

(a) It shall be an unlawful employment practice for an employer to discriminate against any of his employees ... because [she] has ... made a charge ... under this subchapter.

■ A retaliation claim is analogous to an intentional discrimination case and is subject to the same sequence and burden of proof. *Zanders v. National R.R. Passenger Corp.*, 898 F.2d 1127, 1134 (6th Cir.1990). The elements of a *prima facie* case of retaliation are as follows: 1) plaintiff engaged in an activity protected by Title VII; 2) the exercise of [her] civil rights was known by the defendant, 3) thereafter, the defendant took an employment action adverse to the plaintiff; and 4) there was a causal connection between the protected activity and the adverse employment action. *Christopher v. Stouder Memorial Hospital*, 936 F.2d 870 (6th Cir.), *cert. denied*, —— U.S. ——, 112 S.Ct. 658, 116 L.Ed.2d 749 (1991), *citing, Wrenn v. Gold*, 808 F.2d 493 (6th Cir.1987).

■ If the plaintiff establishes a *prima facie* case by a preponderance of the evidence, the burden shifts to the defendant to articulate a legitimate, non-retaliatory reason for its action. *Zanders*, 898 F.2d at 1135. If the defendant meets this burden, the plaintiff bears the ultimate burden of persuading the court that the defendant's reason is pretextual. *Burdine, supra.* If a legitimate nonretaliatory reason for the ad-

verse action is articulated by the defendant, the presumption of discrimination which flows from the *prima facie* case is eliminated. *Weems v. Ball Metal & Chemical Division, Inc.*, 753 F.2d 527, 529 n. 2 (6th Cir.1985). The burden of persuasion remains at all times on the plaintiff. *Burdine, supra.*

There is no dispute that Smith engaged in protected activity in January, 1988, by virtue of filing a complaint with the Ohio Civil Rights Commission, that Chief Newby knew that she had filed the complaint, and that she was not promoted to major in 1990. However, this Court is not persuaded that there was a causal connection between the filing of Smith's OCRC complaint and her non-selection for promotion.

In support of her retaliation claim, Smith essentially relies on a meeting which took place just after she had filed the OCRC complaint. Vol. II at 71. At that meeting, McDaniel told Smith that it would not be in her interest to file a discrimination complaint because it would indicate that she was not a part of the management team. *Id.* at 71–72. However, the evidence shows that subsequent to filing the OCRC complaint, Smith was selected to attend a program in San Francisco, and she was assigned to the investigation bureau, a job that she enjoyed. She also claimed that assignment as Second District Commander, a job she did not want, after she was denied the promotion was further proof of discriminatory intent. The Court cannot agree. Service as a District Commander was a credential lacking from her record and one that figured prominently in the records of two of those promoted, Jerry Morgan and Virgil McDaniel. The Court credits Chief Newby's testimony that the assignment was intended to enhance her experience with a view toward possible later promotion.

The Court heard a great deal of testimony about Lt. Smith's performance after the 1990 Major promotions, none of which now seems at all material to a decision.

With these facts in mind, the Court cannot say that Smith has established a causal link between her protected activity and Dayton's failure to promote her in 1990. Therefore, this Court finds that Smith has failed to establish a *prima facie* case of retaliation. Accordingly, Lt. Smith's Count Three also fails.

## CONCLUSION

The Defendant having prevailed on summary judgment on Plaintiff's § 1983 and state law claims and on the merits at trial on Plaintiff's Title VII claims, it is hereby ORDERED that judgment be entered in favor of the Defendant and against the Plaintiff, dismissing the Complaint herein with prejudice.